JACOB M. KAPLAN AND ALICE M. KAPLAN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 37873. Promulgated October 29, 1953.

---

*Harris Berlack, Esq.*, for the petitioners.
*Robert McDonough, Esq.*, for the respondent.

ARUNDELL, *Judge:* The respondent has determined a deficiency in the amount of $35,853.24 in the income tax of the petitioners for the taxable year 1946. The issues to be decided are as follows:

1. Whether 172 issues of stock from a block of 186 issues purchased in the name of J. M. Kaplan, hereinafter referred to as petitioner, were bought by him and later sold to Navajo Corporation, hereinafter sometimes referred to as Navajo, or whether the purchased securities were bought for the account of Navajo and in error placed in the name of petitioner and the transfer to Navajo was made solely to correct that error.

2. Whether the "wash sales" provisions of section 118 (a) of the Internal Revenue Code apply to losses amounting to $12,468.89 sustained by petitioner on the sales on September 10, 1946, of securities identical with stocks included in the purchase of 186 issues on September 25, 1946.

3. Whether the transfer of 172 issues of stock to Navajo on November 4, 1946, resulted in short-term capital gains of $25,468.80, taxable to petitioner, and losses amounting to $30,921.56, not deductible by petitioner because of section 24 (b) (1) (B) of the Code.

4. Whether $4,189.01, the excess of the aggregate cancellation of petitioner's indebtedness to Navajo over the aggregate of the closing market prices on the date of the transfer of the 172 security issues, constitutes taxable income to the petitioner.

5. Whether the sum of $6,500 claimed by petitioner for travel and entertainment expense was a proper deduction.

6. Whether losses amounting to $20,240.41 on sales of securities by petitioner to a nonstock charitable corporation, of which petitioner, his wife, and his brother were the only members, were properly disallowed under section 24 (b) (1) (B) of the Code.

One additional issue involving charitable contributions was disposed of at trial by agreement of counsel.

### FINDINGS OF FACT.

The petitioners herein are husband and wife and filed a joint income tax return for 1946 with the collector of internal revenue for the second district of New York. At all times material hereto, Navajo Corporation was a Delaware corporation of which petitioner was president and owner of all of its outstanding stock. The assets of Navajo in 1946 amounted to at least $10,000,000 consisting mainly of real estate and stocks and bonds, including about 50 per cent of the stock of the Welch Grape Juice Company, hereinafter sometimes referred to as Welch. Petitioner was president of Welch.

In normal course, securities were purchased for the account of Navajo and also for petitioner's individual account through his office in New York City. Petitioner also directed the purchase and sale of securities for the accounts of his wife, his two brothers, his sister, and for the J. M. Kaplan Fund, Inc. Petitioner made the decisions as to what purchases and sales of securities should be made, giving written or verbal instructions to Carl Buchner, an employee of many years' standing. Buchner placed the orders to buy or sell with brokers and gave the necessary instructions for the receipt or delivery of the securities and the payment therefor. He also had authority to sign checks on behalf of petitioner and Navajo. Petitioner generally gave instructions to Buchner as to the account for which the securities were to be bought or sold.

Petitioner was a busy man, frequently working under pressure, and he sometimes told Buchner to buy the securities for the account which had the most funds. On occasion, petitioner failed to tell Buchner which account securities were to be purchased for and, in that event, Buchner used his own judgment, usually buying in accordance with any purchase program then in progress. Occasionally, Buchner made mistakes, in which cases the errors were ordinarily corrected as soon as they were discovered.

In the early part of September 1946, petitioner's funds were fully invested in securities and he was indebted to banks in the amount of about $1,000,000. The funds of Navajo Corporation were also fully invested in securities and it was indebted to banks for more than

$1,000,000. As the result of a sudden decline in the market, petitioner, on September 10 and 11, 1946, sold virtually all of his personal security holdings at a loss of approximately $400,000 and paid off his bank indebtedness. At the same time, he directed the sale of a part of the stocks owned by Navajo and substantially reduced its indebtedness. Within the next two weeks petitioner regained confidence in the market and on September 24, 1946, wrote out a list of a large number of stocks to be bought the following morning. Petitioner did not have sufficient available cash to pay for this purchase but Navajo did have sufficient funds available at the time.

Petitioner arrived at his office before 10 a. m. the next morning, September 25, 1946, and, although he was already busy with several visitors, he called for Buchner and handed him the list of securities to be purchased, telling him to buy them at market. Buchner had the impression that he was to buy them for petitioner's personal account. Under Buchner's orders to a number of brokers, 186 different issues of securities were bought in petitioner's name at an aggregate cost of $1,278,815.03. The securities were paid for to the extent of $1,110,000 with funds furnished by Navajo Corporation, which amount was entered on Navajo's books as a loan to petitioner. The transfer of the money was effected by the deposit in petitioner's account of three checks drawn on Navajo and signed by Buchner and one of his assistants. Buchner did not tell petitioner about the transfer of funds nor was it his practice to do so in such cases since he had authority to make such transfers.

During the period from September 25, 1946, to November 4, 1946, petitioner received dividends on the securities totaling $2,993.75, which amount was reported in the petitioners' joint income tax return for 1946 and not in the return of Navajo Corporation. Fourteen of the 186 issues of stock were sold in the open market on September 30, 1946, at an aggregate loss of $2,273.56, which loss was deducted in the petitioners' joint return for 1946 and not in Navajo's return. That return was prepared under the supervision of petitioner's tax counsel. Petitioner was aware of these items in his return at the time he signed it.

In October 1946, about the middle of the month, petitioner's tax counsel telephoned him to inquire about the increase in petitioner's indebtedness to Navajo, pointing out that such borrowing was in conflict with the policies previously recommended by counsel. Petitioner stated that he was not so indebted and that it had been his intention for Navajo to purchase the securities in question. The aggregate market value of the securities at that time was more than $100,000 below their aggregate cost. Petitioner then told Buchner that a mistake had been made which had to be corrected but that on advice of counsel Buchner

was not to transfer the securities to Navajo until the aggregate market value of the stocks was approximately equal to the aggregate original cost.

Thereafter, Buchner priced the securities at market each day. On the morning of November 4, 1946, he reported to petitioner that the market value had reached the approximate cost level. Petitioner then directed Buchner to transfer the remaining 172 issues to Navajo. The stock was transferred to Navajo Corporation on November 4, 1946, which transfer was not reflected as a sale of securities or otherwise in petitioners' income tax return for 1946. The aggregates of the fair market values of the securities on November 4, 1946, were as follows:

Based upon the highest market price of each security on November 4, 1946_____ $1,249,747.50

Based upon the closing market price of each security on November 4, 1946_____ $1,229,890.00

The following entry was made in the general journal of petitioner under date of November 4, 1946:

Loans Payable (Navajo Corporation)_____ $1,234,079.01
  Security Custodian a/c_____ $1,234,079.01
(To record the sale this date of the securities on attached list to Navajo Corporation at cost (market $1,229,362.50) and the payment therefor by reduction of present loan balance)

The general journal of Navajo Corporation includes the following entry under date of November 4, 1946:

Sec. Custodian (See List)_____ $1,234,079.01
  Loans & a/c Rec. (J. M. Kaplan)_____ $1,234,079.01
(To record the purchase this day of the securities on the attached list, from J. M. Kaplan and the payment therefor by reducing his indebtedness to this corporation.)

Buchner and his two assistants were the only people who regularly worked on the books of Navajo and petitioner.

On November 4, 1946, Buchner wrote in petitioner's name to the Commercial National Bank & Trust Company which handled the physical custody of the securities, advising them that on that date he had sold the securities described on a list attached to Navajo Corporation and that Navajo had agreed to absorb the cost of the Federal and New York State transfer tax stamps.

On February 27, 1946, petitioner received a dividend of $75,000 from Navajo Corporation. The amount of earnings and profits available for the declaration of dividends in Navajo Corporation for the fiscal year ended February 28, 1947, was substantially in excess of $4,189.01.

Among the stocks sold by petitioner on or about September 10, 1946, were 1,000 shares of American Gas & Electric Corporation, 100 shares of Seeger Sunbeam Corporation, 2,000 shares of Sunshine Mining Company, 100 shares of Simmons Company, and 200 shares of Gimbel

Brothers, Inc. The aggregate loss on these sales was more than $12,468.89. Among the 186 issues purchased in petitioner's name on September 25, 1946, were 500 shares of American Gas & Electric Corporation, 500 shares of Seeger Sunbeam Corporation, 1,000 shares of Sunshine Mining Company, and 200 shares of Simmons Company. Four hundred shares of the stock of Gimbel Brothers, Inc., were purchased in petitioner's name on or about September 30, 1946.

During 1946, petitioner went on a number of trips throughout the country in connection with his interests in Navajo and Welch. The trips were devoted partly to efforts to develop the cooperative movement in the grape industry and to improve relations between Welch and the cooperative organizations from which it purchased grapes. Petitioner was also exploring investment possibilities for Navajo. He received no salary from either of those corporations, nor did he request or receive reimbursement from either corporation for expenses incurred on his trips. Petitioner considered it undesirable to request reimbursement on the theory that it would set a bad example for the young executives and employees of the corporations. He also entertained a number of out-of-town visitors, largely farmers and university people interested in the grape-growing cooperatives, for which he was not reimbursed. Petitioner kept no records of the amounts expended. The amount so expended by petitioner was $6,500.

On or about September 10, 1946, petitioner sold to The J. M. Kaplan Fund, Inc., 200 shares of Class A capital stock and 700 shares of Class B capital stock of the North American Rayon Company and 1,000 shares of stock in the Louisiana Land and Exploration Company, on which sales he sustained losses aggregating $20,240.41.

The J. M. Kaplan Fund, Inc., was a membership corporation organized and existing under the laws of Delaware having no authority to issue capital stock and having no capital stock issued or outstanding. Its only members were petitioner, his wife, and his brother. It was organized and operated exclusively for benevolent, charitable, educational, scientific, and literary purposes and no part of its earnings or assets could inure to the benefit of its members or any private individual. It was ruled by respondent to be exempt from taxation under the provisions of section 101 (6) of the Internal Revenue Code. The assets of the J. M. Kaplan Fund, Inc., consisted entirely of contributions received for its corporate purposes. More than 50 per cent of such contributions amounting to $2,000,000 or more was given by the petitioner personally or by corporations controlled by him. The J. M. Kaplan Fund, Inc., had the power to invest and reinvest its funds in securities and real and personal property of any and every kind and to sell and transfer such property in furtherance of its objects and purposes. No securities were ever sold to petitioner by the J. M. Kaplan Fund, Inc.

OPINION.

## Issue I.

On September 25, 1946, certain shares of 186 different securities were purchased in petitioner's name at an aggregate cost of $1,278,-815.03. Respondent has determined that those shares were in fact purchased by petitioner and were his property, the bulk of which was later sold to Navajo Corporation. It is petitioner's contention that the stock should have been purchased by and for Navajo Corporation, his wholly owned company, but that through a mistake on the part of his assistant, Carl Buchner, the securities were erroneously bought in petitioner's name and subsequently transferred to Navajo merely to correct the error. The correctness of that contention must be determined initially since the decision on this issue will directly affect the treatment of certain subsequent issues.

In support of his contention, petitioner has testified that it was always his intention that the securities should be purchased by Navajo with its own money. Navajo had the necessary funds readily available, whereas petitioner had only recently sold virtually all of his personal security holdings to pay off his indebtedness to banks and was not in a position to make an investment of that magnitude without borrowing the money. There is evidence that petitioner expressed surprise when he was informed that Buchner had purchased the securities for his individual account, borrowing the money from Navajo Corporation. Buchner was an old and trusted employee who customarily carried out petitioner's instructions as to the purchase and sale of securities both for his personal account and that of Navajo with full authorization to sign the necessary orders and checks. Petitioner avers that immediately upon discovering the situation he took steps to correct the error.

If we had before us only the circumstances set forth above, our decision in *Lanteen Medical Laboratories, Inc.*, 10 T. C. 279, would require a finding for petitioner on this issue since it is well settled that where book entries are found to be at variance with the facts decision must rest on the facts. *Doyle* v. *Mitchell Brothers Co.*, 247 U. S. 179. But in the case at bar, it is not clear that the transaction between petitioner and Navajo Corporation was merely a correction of bookkeeping entries. On the contrary, there are a number of factors inconsistent with if not repugnant to petitioner's assertions. During the period between September 25, 1946, the date of original purchase of the securities in Kaplan's name, and November 4, 1946, the date of the transfer to Navajo, petitioner received dividends amounting to $2,993.75 on the securities. On September 30, 1946, fourteen of the 186 issues were sold on the open market at an aggregate loss of

$2,273.56. These dividends and losses were included in petitioner's individual income tax return for the taxable year 1946. The return was reviewed by petitioner's tax counsel and accountant after preparation by his staff, and petitioner testified that when he signed the return he was aware that the items had been included.

The journal entries on the books of Kaplan and of Navajo Corporation reflecting the transfer of the remaining 172 issues make no reference to anything in the nature of a correction, calling it rather a "sale" and a "purchase," respectively. The letter of November 4, 1946, to the bank which had physical custody of the certificates, signed by Buchner on Kaplan's behalf, contained the following:

This is to advise you that I have today *sold* all of the securities described on the attached list to Navajo Corporation * * *.

In connection with this transaction, Navajo Corporation has agreed to absorb the cost of the Federal and New York state transfer tax stamps * * *. [Emphasis supplied.]

Petitioner could not clearly remember his instructions to Buchner when he first directed the purchase of the securities. He conceded, however, on cross-examination that he could have said "buy them for my account" or "buy me these securities." After being informed in October by his tax counsel that he was indebted to Navajo for more than 1 million dollars, petitioner told Buchner that an error had beeen made and that it must be corrected. He told Buchner to prepare a daily computation of the market value of the remaining 172 issues until the aggregate market value was approximately equal to the aggregate cost. Petitioner testified that when Buchner informed him some days later that market value had approximated cost, he said "Sell them at once."

In view of the many inconsistencies and after reviewing all of the evidence, we are of the opinion that petitioner has failed to meet the burden of proof that he was never the owner of the securities in question and we, therefore, find from the whole record that the shares were originally purchased for petitioner's account and were his individual property. The facts herein are clearly distinguishable from those in the *Lanteen* case, *supra*.

## *Issue II.*

Among the 186 issues of stock purchased by petitioner on September 25, 1946, were 500 shares of American Gas & Electric Corporation, 500 shares of Seeger Sunbeam Corporation, 1,000 shares of Sunshine Mining Company, and 200 shares of Simmons Company. On September 30, 1946, petitioner purchased 400 shares of Gimbel Brothers, Inc., stock. On or about September 10, 1946, petitioner had sold 1,000 shares of American Gas & Electric Corporation, 100 shares of Seeger

Sunbeam Corporation, 2,000 shares of Sunshine Mining Company, 100 shares of Simmons Company, and 200 shares of Gimbel Brothers, Inc., stock, all at substantial losses. Respondent has determined that to the extent of $12,468.89 the losses on the sales of September 10, 1946, are not allowable because of the "wash sales" provisions of section 118 (a) of the Internal Revenue Code.[1] Petitioner's only basis for contesting the disallowance is his primary contention that the stocks purchased on September 25, 1946, were at all times the property of Navajo Corporation. He concedes that a finding for respondent on Issue I above must result in a finding for respondent on the "wash sales" issue. It follows that the deficiency determined by the respondent on Issue II is entirely correct.

## Issue III.

Having found in Issue I above that the 186 issues of stock purchased on September 25, 1946, must be regarded as having been the property of petitioner, it follows that the transfer of 172 of those issues on November 4, 1946, must be considered as a sale to Navajo Corporation. Respondent has determined that petitioner realized capital gains amounting to $25,468.80 on the transfer of those securities which had appreciated in value since their acquisition by petitioner. Respondent further determined that on those securities, which had depreciated in value since petitioner acquired them, losses of $30,921.56 were sustained, but disallowed those losses under section 24 (b) (1) (B) of the Code.[2] Respondent's position is based on a line of cases which make it clear that in ascertaining gain or loss on sales of property each transfer is a separate unit as to which cost and sale price are to be compared. *Lakeside Irrigation Co.* v. *Commissioner*, 128 F. 2d 418, certiorari denied 317 U. S. 666; *Reddington* v. *Commissioner*, 131 F. 2d 1014; *Morris Investment Corporation* v. *Commissioner*, 156 F. 2d 748. All of those cases involved transfers of a number of securities, some

---

[1] SEC. 118. LOSS FROM WASH SALES OF STOCK OR SECURITIES.

(a) In the case of any loss claimed to have been sustained from any sale or other disposition of shares of stock or securities where it appears that, within a period beginning 30 days before the date of such sale or disposition and ending 30 days after such date, the taxpayer has acquired (by purchase or by an exchange upon which the entire amount of gain or loss was recognized by law), or has entered into a contract or option so to acquire, substantially identical stock or securities, then no deduction for the loss shall be allowed under section 23 (e) (2) ; nor shall such deduction be allowed under section 23 (f) unless the claim is made by a corporation, a dealer in stocks or securities, and with respect to a transaction made in the ordinary course of its business.

[2] SEC. 24. ITEMS NOT DEDUCTIBLE.

(b) LOSSES FROM SALES OR EXCHANGES OF PROPERTY.—

(1) LOSSES DISALLOWED.—In computing net income no deduction shall in any case be allowed in respect of losses from sales or exchanges of property, directly or indirectly—

\* \* \* \* \* \* \*

(B) Except in the case of distributions in liquidation, between an individual and a corporation more than 50 per centum in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual ;

of which had appreciated and some of which had depreciated in value since their acquisition by the transferor.   In each case it was held that the sale of each security issue must be treated separately with gains being taxable and losses disallowed as required by the statute because of the relationship between the seller and the purchaser.

Petitioner attempts to distinguish those cases by pointing out that in each of them the securities were transferred at their fair market values.   He relies on the fact that respondent herein admitted, in his answer, an allegation in the petition that each security was transferred to Navajo at its cost to petitioner and asserts that where a security is sold at cost there can be no question of gain or loss.

The effect of that admission in the answer of respondent was raised in connection with respondent's motion for leave to amend his answer. Although the motion was denied, counsel for petitioner, in the course of argument on that motion, expressly conceded that the admission would not preclude the respondent from arguing that each of the security transfers could be taxed as if it had been transferred at market, and that he was perfectly satisfied to have that issue before this Court. If the transfer had been made between parties dealing at arm's length, we might well find some merit in petitioner's contention that no gain or loss was realized because of the transfers at cost but we are dealing here with transfers from Kaplan, the individual, to a corporation wholly owned, controlled, and dominated by Kaplan, the stockholder and president.   In enacting section 24 (b) (1) (B), the intention of Congress obviously was to prevent the fixing of losses by transactions between taxpayers and companies in which the taxpayer owns a majority of the value of the stock.   *Reddington* v. *Commissioner, supra.* It should be noted that the statute prohibits deductions of losses from sales of property *directly* or *indirectly.*

Here we have a situation where a sole stockholder wishes to transfer to his wholly owned corporation 172 issues of securities, some of which have appreciated in value and some of which have depreciated since he acquired them.   If he transferred them at market the *Lakeside, Reddington,* and *Morris* cases, *supra,* would plainly require the disallowance of the losses and the taxing of the gains.   We think that to permit the taxpayer to avoid the effect of the statute by the simple expedient of transferring at cost rather than at market would nullify the obvious intention of Congress.   Petitioner after conferring with his tax counsel was obviously concerned with market value.   He deliberately delayed the transfer until the over-all market price was as close to his cost as he could reasonably hope it would ever be.   We are of the opinion that within the narrow confines of the relationship of the parties to the transfers, the respondent was fully justified in looking behind the form of a transfer at cost to the realities of the situa-

tion and treating the transaction as if it had been a transfer at market. The principle that substance and not form should control in the application of the tax laws is well established. *Weiss* v. *Stearn*, 265 U. S. 242. It follows that respondent properly determined that the petitioner realized short-term gains of $25,468.80 and nondeductible short-term losses of $30,921.56 on the sales of November 4, 1946.

There is no merit in petitioner's assertion under the facts in this case that, in transferring at cost issues which had appreciated in value, the excess of market over cost should be considered a contribution to the capital of the corporation. If this line of reasoning were carried to its logical conclusion, the excesses of cost over market on those securities which had depreciated in value would be considered as a distribution from the corporation to petitioner and a taxable dividend in light of the substantial earnings of Navajo Corporation. It is worth noting that if all 172 transfers were considered on that basis, the benefits passing from the corporation to petitioner would exceed those passing from him to the corporation.

## Issue IV.

In connection with the transfer of 172 issues of stock from petitioner to Navajo Corporation on November 4, 1946, petitioner's indebtedness to that corporation was canceled to the extent of $1,234,079.01. Respondent has determined that the fair market value of the securities transferred was $1,229,890, that amount being the aggregate of the closing market prices on the date of the transfer. The deficiency, as determined by respondent, includes an item of added income amounting to $4,189.01, the excess of the canceled indebtedness over the aggregate fair market value applied by respondent.

Petitioner first attacks the respondent's valuation of the securities. He points out that the aggregate of the high prices of the securities in the stock market on November 4, 1946, was $1,249,747.50 and asserts that since the securities were transferred to Navajo during the day and not at the close of the day, it should be presumed that the value at the exact time of the transfer was equal to or greater than the cost.

We need cite no authority for the well-established principle that the respondent's determination of value is presumptively correct and that the burden is on the petitioner to rebut it. Petitioner herein has not met that burden. We are told only that the securities were transferred at some time during the day of November 4, 1946, and that the aggregate market prices exceeded cost at some time during that day. Petitioner shows no relation between the time of transfer and the time of the market high, and we therefore sustain respondent in his determination of the fair market value.

Petitioner further contends that the question of whether a dividend or taxable cancellation of indebtedness results from a transfer of

property by a stockholder to a corporation at more than market value depends on whether there was a corporate intention to pay a dividend or to cancel an indebtedness. In support of that contention, he cites such cases as *Palmer* v. *Commissioner*, 302 U. S. 63; *Choate* v. *Commissioner*, 129 F. 2d 684, and *Unique Art Manufacturing Co.*, 8 T. C. 1341. None of those cases, however, deals with transactions between a wholly owned corporation and its sole stockholder. In each of them the Court could rely on a bona fide corporate intention separate and distinct from the intention of any stockholder. In the case at bar, the net effect of the transfer of the 172 issues with a fair market value of $1,229,890 in return for the cancellation of $1,234,-071.01 of petitioner's indebtedness was the enrichment of petitioner at the expense of his wholly owned corporation in the amount of $4,189.01.

In the circumstances here present and in view of petitioner's complete and sole domination over the affairs of Navajo Corporation, we think that respondent correctly determined that petitioner received a dividend in the sum of $4,189.01 and thus realized taxable income from the transaction of November 4, 1946.

### *Issue V.*

In his income tax return for the year here in question, petitioner claimed a deduction of $6,500 as traveling and entertainment expense, which entire amount was disallowed by the respondent. The only evidence as to the alleged expenditures is petitioner's own testimony. While conceding that he kept no record of his expenditures, petitioner estimated that he made between 6 and 12 trips to all parts of the country in 1946, spending from a day to a month and from $200 to $1,000 on each trip. The purpose of those trips according to petitioner was twofold. As regards Navajo Corporation, petitioner states he "was interested in what goes on all over America and all over the world * * * from the point of making investments." As regards Welch Grape Juice Company, petitioner describes himself as an evangelist or missionary for the cooperative movement among growers of grapes, his idea being to stimulate the production of grapes throughout the country, thereby increasing the supply of raw materials used by Welch.

Petitioner further testified that farmers and university people came to visit him in New York at least six times during 1946 and that he entertained them at an average cost of more than $500 per visit. Petitioner submitted no expense accounts either to Welch or Navajo, nor was he reimbursed by either corporation. We are of the opinion that $6,500 is a fair valuation of the amounts so expended by petitioner. It is petitioner's contention that the expenses claimed are deductible

under section 23 (a) (2)[3] as expenses paid for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income.   In essence, then, it is petitioner's position that the expenditures in question were made by him not as an officer but rather as a shareholder of Welch and Navajo.

There are at least two reasons for disallowing the deductions. While the trips and entertainment undertaken by petitioner may have enhanced the chances of success of the two corporations, the immediate benefit inured to those corporations.   Insofar as the petitioner's expenditures related to the production or collection of income or to the management, conservation, or maintenance of property held for the production of income, it was to the income or property of the corporations and not to that of petitioner.   As a general rule, for tax purposes a corporation is an entity distinct from its stockholders. *Dalton* v. *Bowers*, 287 U. S. 404.   Deductions are personal to the taxpayer and one taxpayer may not take deductions properly belonging to another.   *Hal E. Roach*, 20 B. T. A. 919.   Although the corporations may prosper and flourish, no taxable income is realized by the stockholders until the profits are distributed to them.   The statute contemplates the deduction of only such ordinary and necessary nontrade or nonbusiness expenses as are personal to the taxpayer.   Only those expenses proximately and immediately relating to his own income or property are deductible.   It does not embrace expenses of a separate and distinct taxpayer.   *Deputy* v. *DuPont*, 308 U. S. 488.

Moreover, in the case of a stockholder, there may be deducted as "ordinary" only that which can be placed in the category of expenses which a substantial stockholder engaged in conserving or enhancing his estate would ordinarily incur.   Typical of such ordinary expenses are the rental of safe-deposit boxes, costs of investment counsel or investment services, salaries of secretaries, and the like.   *Low* v. *Nunan*, 154 F. 2d 261.   Stockholders do not ordinarily incur or pay expenses such as those claimed to be deductible here.   Respondent properly disallowed the entire amount of $6,500 deducted for traveling and entertainment expense.

### Issue VI.

Respondent has determined that losses in the amount of $20,240.41 sustained by the petitioner on the sale of certain securities to the J. M. Kaplan Fund, Inc., must be disallowed as sales to a corporation con-

---

[3] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

(a) EXPENSES.—

(2) NON-TRADE OR NON-BUSINESS EXPENSES.—In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.

trolled by petitioner. Respondent's primary basis for this determination is section 24 (b) (1) (B) of the Internal Revenue Code. Petitioner relies on the fact that the J. M. Kaplan Fund, Inc., is a membership corporation for charitable purposes without any shares of stock outstanding or even authorized. He submits that since section 24 (b) (1) (B) refers only to sales involving a corporation "more than 50 per centum in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual," that section cannot be applied to a situation involving a nonstock corporation. We think petitioner's position is well taken, the statute being clear and unambiguous. There is no merit in the contention that the correct test is the degree of a taxpayer's control of the corporation rather than the ownership of a majority of the value of the outstanding stock. A corporation may have two or more classes of stock, with voting rights restricted to holders of one class. Thus, a single taxpayer owning all of the voting stock and therefore completely controlling the company might at the same time own only 10 or 20 per cent of the value of all of the outstanding stock. Section 24 (b) (1) (B), however, clearly would not apply since the test is expressly stated in terms of percentage of stock ownership rather than control.

Respondent further contends that even if section 24 (b) (1) (B) is inapplicable, the decision of the Supreme Court in *Higgins* v. *Smith*, 308 U. S. 473, requires the disallowance of the losses here in question. Petitioner objects strenuously to the respondent's raising this alternative theory in his brief after referring only to the Code section in his deficiency notice and at the hearing. In view of the many considerations that necessarily enter into the application of the *Higgins-Smith* principle, we agree with petitioner that the raising of this new issue is not timely.

We find accordingly that respondent erroneously disallowed the deduction of losses amounting to $20,240.41 on the sale of the securities to the J. M. Kaplan Fund, Inc., and that portion of the deficiency must be set aside.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

OPPER, *J.*, dissents as to Issue VI.