**BOOMHOWER, Inc., Plaintiff-Appellant,**

v.

**H. G. FISCHER & CO., Inc.,**
**and**
**Alan Mathis, Defendants-Appellees.**
**No. 12087.**

United States Court of Appeals
Seventh Circuit.
Jan. 24, 1958.

Rehearing Denied Feb. 20, 1958.

S. T. Sutton, Chicago, Ill., Thaddeus G. Benton, New York City, W. M. Ketchum, Chicago, Ill., for appellant.

Robert C. Pierce, Chicago, Ill., Russell B. Burt, Chicago, Ill., for defendants-appellees.

Before MAJOR, SCHNACKENBERG and HASTINGS, Circuit Judges.

HASTINGS, Circuit Judge.

Plaintiff, Boomhower, Inc., a Delaware corporation dealing in medical equipment, brought this action for damages against defendants, H. G. Fischer

& Co., Inc. (Fischer), an Illinois corporation which manufactures and supplies such equipment, and Alan Mathis (Mathis), its president; the damages having allegedly resulted from breaches of a contract whereby plaintiff was appointed as the exclusive sales representative of the corporate defendant in the distribution of its products in Washington, D. C. and at least parts of Virginia and Maryland. The case was tried to the court without a jury, and at the conclusion of plaintiff's evidence, on defendants' motion, the court below entered its finding and judgment favorable to defendants, from which plaintiff now appeals.

Prior to October, 1950, D. W. Boomhower & Co., a business privately owned by D. W. Boomhower, acted as sales representative of Fischer in the above-mentioned area. About October, 1950, one T. G. Benton, a lawyer, organized the plaintiff corporation with his own capital and purchased the business and assets of Boomhower & Co. Benton was president of his new corporation, and Boomhower, the former proprietor, and Ed M. Raney were vice-presidents. Benton was without experience in this line of business and placed Raney in full charge of plaintiff's operations.

On October 6, 1950, Boomhower, as vice-president of plaintiff, wrote a letter to Fischer, directed to the attention of Mathis, informing them of the incorporation of plaintiff, its purchase of the Boomhower Co. business, giving the names of the officers with an account of Benton's personal background, stating that Raney would remain in full charge of the business, and requesting Fischer to write plaintiff assuring it of the continuation of "our Sales Franchise with you and your continued support and co-operation." This letter was supplemented by a second letter (undated but written about the same time) from Boomhower to defendants requesting assurance of the same dealer and cash discounts as under the former ownership, and that future advertising sent out by

Fischer for this territory be under plaintiff's name.

On October 12, 1950, Fischer through Mathis as president acknowledged receipt of these two letters, offered its congratulations and best wishes for success and wrote further that "[w]e certainly expect to extend to Boomhower, Inc. all possible support and co-operation and extend to them the same discounts and terms that we have extended to D. W. Boomhower Co." Acting on this exchange of letters the parties continued the supplier-dealer arrangement that had previously existed between Boomhower individually and Fischer. There was no formal assignment of the original contract between Boomhower & Co. and Fischer.

Sometime later (probably in March, 1951) Ed Raney wrote to defendants from his home address and referred to a conversation he had had with Mathis in Chicago in January, 1951, in which Raney had intimated that the Boomhower situation might not be satisfactory and had inquired about the possibility of taking over the Fischer franchise exclusively in the Washington, D. C. area. He wrote further that Benton had no conception of the business and had created dissension among the salesmen. He went on to say he could see a complete disintegration of the sales organization and that he thought he could take a key man or two and double the Fischer business in that area. He concluded by stating that he had available capital to handle the business and inquired whether he might have the territory exclusively for himself and take it away from the present arrangement. Raney prefaced his letter with a request that it be considered as completely confidential and at the end asked that the reply be sent to his home address.

Under date of March 27, 1951, Fischer through Mathis as president replied to Raney at his home address in Washington, D. C. to the effect that "[i]f, as you state in your letter, it appears that Boomhower, Inc. as it is presently set

up bids fair to disintegrate as a proper sales force for our line and you feel that you can take over our line advantageously yourself, we, of course, are agreeable to turning our representation over to you * * *." (Our emphasis.) The letter went on to describe possible territory and concluded by saying that Fischer "will be ready to proceed along the line under discussion when we hear further from you." Raney replied on March 31, 1951, making mention of territory and inquiring about notice of cancellation to plaintiff, "which is only fair * * * I certainly do not wish it to be said at any time that there was any 'scullduggery' [*sic*] in the transaction."

Raney wrote to defendants again on April 5, 1951, that "[t]his affair has become an open brawl!", discussing his sharp differences with Benton, and once more asking that the letter be kept confidential. On April 9, 1951 defendants replied that they would consider Raney for certain territory in and around Washington, D. C. and that they would want to give plaintiff about one month's notice of cancellation. In the meantime, on April 1, 1951, Raney wrote to D. W. Boomhower personally in Florida, mentioning his hostile attitude toward Benton (referring to him as "the Attorney"), and inviting Boomhower to furnish $5,000 capital for a new corporation Raney proposed to form and personally control to take over the Fischer business from plaintiff. However, Boomhower declined to participate.

About this time Benton demanded that Raney "turn in his keys" and on April 11, 1951 Raney resigned and left plaintiff's service and shortly thereafter went to work for Fischer. Dennis Kane succeeded Raney with plaintiff and worked until late July, 1951. Kane was followed in order by two of plaintiff's salesmen and none of them appears to have been successful. Plaintiff continued to represent Fischer and subsequently the parties executed a formal contract effective October 5, 1951. Finally Fischer canceled plaintiff's contract on April 25, 1952.

It appears that Raney could not raise capital to organize his proposed dealer corporation and Fischer never granted him any franchise. Plaintiff was succeeded as the Fischer dealer by the District X-Ray Company headed by Kane and others.

Plaintiff seeks to recover $36,592 as damages under three separate and alternative theories or causes. The first cause charges that defendants breached the Fischer contract with plaintiff by conniving with Raney in his attempt to appropriate the franchise for his own use. The second cause charges that defendants maliciously interfered with Raney's three-year contract of employment to manage plaintiff's business. The third cause is in trespass on the case charging that defendants conspired with plaintiff's fiduciary (Raney) to take away its property rights under its contracts with Fischer and give them to Raney.

Since the court below sustained defendants' motion for a finding in their favor at the close of plaintiff's evidence, the contested issues here relate primarily to the sufficiency of the evidence: Whether it establishes a breach by defendants of any contractual duties owed by them to plaintiff, and whether it sustains plaintiff's claim that defendants deliberately interfered with the contract of employment between plaintiff, as employer, and Raney, as employee, or conspired with Raney to enable him to embezzle plaintiff's franchise.

After an examination of the entire record we are satisfied that the evidence is wholly insufficient to sustain plaintiff on any of its theories of recovery. In this connection it should be pointed out that plaintiff has sued Fischer and its president, Mathis, and has elected not to sue Raney. We find no evidence that defendants breached any of their contractual obligations to plaintiff as defined either in the October, 1950 exchange of letters or as formally set out in the contract of October, 1951. Likewise, there is no showing that defendants interfered with Raney's contractual employment

with plaintiff, or that defendants ever knew anything about the terms of any such agreement. Similarly, we find no evidence of any conspiracy between defendants and Raney to enable Raney to embezzle plaintiff's franchise and steal plaintiff's employees. It is quite apparent from the transcript of these proceedings that Raney and plaintiff had an unhappy and unprofitable alliance. It is also clear that Raney wanted the franchise for himself, but defendants never gave it to him. Raney did leave plaintiff and take employment with defendants but only after Benton asked for his keys. The district court aptly said, "It would appear to me that this lawsuit has been brought against the wrong people."

This would appear to be one of those unfortunate situations where a lawyer puts his money into a business in which he has had no experience; has an unhappy result and at least four unsuccessful managers; concludes he has been defrauded by a trusted associate but sues someone else; acts as trial and appellate counsel for his own plaintiff corporation; and feels compelled to testify as a witness in his own behalf. It all adds up to a situation to which he can never become reconciled.

Since this appeal turns solely on the sufficiency of the evidence and having found against appellant on that issue, we hold that the district court did not err in its finding favorable to defendants.

The judgment below is

Affirmed.