Thaddeus G. Benton v. Commissioner.
Benton v. Commissioner
Docket No. 82222.
United States Tax Court
T.C. Memo 1962-292; 1962 Tax Ct. Memo LEXIS 16; 21 T.C.M. (CCH) 1554; T.C.M. (RIA) 62292; 17 Oil & Gas Rep. 473; 21 Oil & Gas Rep. 109; December 12, 1962
*16 1. Office expenses paid by petitioner, an attorney, allocable to a corporation of which his wife was sole stockholder, are not deductible by petitioner. 2. Petitioner is not entitled to deduct in 1955 his cost in stock of a corporation which went out of business in 1952, which he purportedly canceled and surrendered in 1955 to satisfy an obligation to a trust of which he was trustee. Petitioner failed to prove the stock had any value in 1955. 3. Payment received by petitioner in 1955 in settlement of a lawsuit is taxable as ordinary income rather than capital gain. 4. Petitioner failed to prove that the settlement payment qualifies either as compensation from an employment under section 1301 or as income from back pay under section 1303, I.R.C. 1954. Thaddeus G. Benton, pro se, 77 Park Ave., New York, N. Y. Andrew S. Coxe, Esq., for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined a deficiency in petitioner's income tax for the year 1955 in the amount of $2,339.70. There are four issues for decision: (1) Whether respondent erred in disallowing a portion of the business expenses deducted by petitioner on his income tax return for 1955; (2) Whether respondent erred in disallowing a $7,500 loss deduction claimed by petitioner on his income tax return for 1955; (3) Whether a settlement payment received by petitioner in 1955 is taxable as ordinary income or as capital gain; and (4) Whether a settlement payment received by petitioner in 1955 was subject to the provisions of section 1301 or section 1303 of the Internal Revenue Code of 1954. [1]
Findings of Fact Some of the facts were stipulated and are found as stipulated. Petitioner was a resident of New York, New *19 York, in 1955 and filed his individual income tax return for that year with the director of internal revenue, New York, New York. At the time of the trial of this proceeding he was a resident of Arlington, Virginia. At the time of the trial of this proceeding, petitioner was a senior hearing examiner for the Interstate Commerce Commission. He was admitted to the bar of the District of Columbia in 1921, the bar of the Supreme Court of the United States in 1924, and the bar of New York in 1928. From 1923 to 1927 he was a special assistant to the Attorney General of the United States. From 1927 to 1943 he engaged in the private practice of law in New York City and also served as an officer and director of the Middle States Petroleum Corporation. From 1943 to 1946 he served as general counsel to the Petroleum Industries Advisory Committee to the United States. From 1946 to 1959 he engaged in the private practice of law in New York City. During the years 1952 through 1955 petitioner also acted as an investment counselor, a trustee, a broker for oil and gas operators, and an agent for oil and gas operators in the raising of capital. In 1950 petitioner organized the Petroleum Financial *20 Corporation for the purpose of engaging in speculative transactions in oil and gas property. Petitioner's wife subscribed to all the capital stock of this corporation. Litigation developed between the corporation and individuals in Texas. Petitioner expended personal funds in 1955 in connection with this litigation, which the corporation subsequently lost. Petitioner was not reimbursed by the corporation for the expenses that he incurred in connection with this litigation. On his 1955 tax return petitioner reported income from his business as a lawyer in the amount of $22,475 and deducted miscellaneous business expenses in the amount of $8,124.86. Respondent determined that $500 of the amount claimed as office expense was neither substantiated nor was it an ordinary and necessary business expense of petitioner's. At the opening of the trial, counsel for respondent explained that the amount disallowed was an estimate of the total office expenses claimed which should be allocated to Petroleum Financial Corporation. In 1947 petitioner was appointed sole trustee of a trust set up by Elizabeth H. Robinson and her son, Edward A. Robinson (hereinafter referred to as the Robinsons). Under *21 the trust agreement petitioner was accountable only for acts of fraud and bad faith in the administration of the trust. In 1950 petitioner organized Boomhower, Inc. (hereinafter referred to as Boomhower), for the purposes of purchasing the medical supply business of D. W. Boomhower and carrying on that business in the District of Columbia and surrounding areas. Boomhower was incorporated under the laws of Delaware on September 29, 1950. The certificate of incorporation authorized 300 shares of cumulative preferred stock and 200 shares of common stock, all of a par value of $100. Petitioner purchased, at a cost of $7,500, 75 shares of the common stock for himself. As trustee, he also purchased 25 shares of the common and 75 shares of the preferred stock for the Robinson trust. Boomhower commenced business on or about October 2, 1950, with petitioner as its president. The business of Boomhower was unsuccessful from its inception. In 1951 Boomhower was in need of additional cash and petitioner advanced it funds of the Robinson trust. Petitioner addressed a letter to the Robinsons, dated March 1, 1951, the body of which was as follows: In the conduct of Boomhower, Inc., from which *22 I am hopeful of making your trust estate some real money, it has been necessary to advance the corporation considerable cash for its purposes. As I too am a stockholder at a cost of $7,500, I am interested in the welfare of the corporation, and in consideration of the making of advances to the corporation by the trust fund, I do hereby agree that unless all of said advances are repaid with interest within, say, four years from date you or the corporation may retain the annexed certificate for all my individually owned stock of the corporation, at your election, the said stock being deliverable to you as security for the repayment of the said advances. Neither the original nor any of the copies of this letter were ever delivered to the Robinsons, nor were its contents ever formally reported to them. The letter and all copies of it were retained in petitioner's files. Boomhower incurred a net loss of $11,021.04 for the fiscal year October 2, 1950, to September 30, 1951; it incurred a net loss of $11,854.99 for the period October 1, 1951, to June 30, 1952; and it incurred a net loss of $14,588.51 for the fiscal year October 1, 1951, to September 30, 1952. Boomhower's most valuable *23 business asset, an exclusive franchise from H. G. Fischer & Co., Inc., to sell that corporation's X-ray machines in the District of Columbia and surrounding areas, was canceled in April 1952. All of the assets of Boomhower, which consisted primarily of inventory, were sold sometime in September 1952 for approximately $12,000. The payment was partially in cash and partially in chattel mortgage promissory notes, the latter of which were endorsed over to petitioner. The corporation conducted no business after September 1952. The corporation's certificate of incorporation was forfeited for nonpayment of Delaware taxes in 1956. Boomhower's balance sheet as of September 30, 1952, as shown on its income tax return for the taxable year ending September 30, 1952, was as follows: ASSETS: Cash
$ 569.58
Accounts receivable
467.82
Note receivable
198.80
Salesmen's advances
5,749.17
Prepaid insurance
574.74
TOTAL ASSETS
$ 7,560.11
LIABILITIES: Accrued expense
$ 725.25
D.C. sales tax
5.51
Md. sales tax
30.00
F.I.C.A. tax
49.76
Withholding tax
51.00
Notes payable T. G. Benton
14,932.09
TOTAL LIABILITIES
$15,793.61
NET WORTH: Preferred stock
$ 7,500.00
Common stock
11,000.00
$18,500.00
Surplus
(26,733.50)
(8,233.50)
TOTAL LIABILITIES AND NET
WORTH
$ 7,560.11
*24 The $5,749.17 listed as "Salemen's advances" on the asset side of the balance sheet was never fully recovered by Boomhower. Most if not all of the $14,932.09 listed as "Notes Payable T. G. Benton" constituted notes payable to petitioner in his capacity as trustee of the Robinson trust. Boomhower instituted a suit against the American Automobile Insurance Company and others in the United States District Court for the District of Columbia in 1952, on a fidelity insurance policy to recover for allegedly dishonest acts of certain employees, including an employee, Dennis J. Kane, who was also named as codefendant. A counterclaim was filed by Kane against Boomhower. The case was tried on May 19, 1954; the complaint was dismissed and a money judgment was entered for Kane against Boomhower on August 24, 1954, in the amount of $1,463.26 plus interest from September 21, 1951. Boomhower appealed, seeking a new trial mainly by reason of the alleged incompetence of the trial judge. The appeal was dismissed by the Court of Appeals for the District of Columbia, the opinion being found at 220 F. 2d 488 (1955), rehearing denied March 29, 1955. The Supreme Court of the United States *25 denied certiorari at 350 U.S. 833 (1955). On April 28, 1953, Boomhower filed a complaint in the United States District Court for the District of Columbia against D. W. Boomhower alleging material misrepresentation of fact in the sale of his business and assets to Boomhower. The case was tried in the District Court during the May term 1956, and judgment was entered for the defendant on May 28, 1956. On appeal to the Court of Appeals, the judgment of the District Court was affirmed. 243 F. 2d 254 (1) (C.A.D.C. 1957), rehearing denied May 10, 1957). On July 26, 1955, Boomhower filed a complaint in the United States District Court for the Northern District of Illinois (Eastern Division) against H. G. Fischer & Co., Inc., and Alan Mathis, for breach of contract and damages. The trial court granted a motion for judgment for the defendants at the conclusion of plaintiff's evidence. The Court of Appeals for the Seventh Circuit affirmed the judgment in 1958. 251 F.2d 611 (1958), rehearing denied February 20, 1958, certiorari denied 356 U.S. 968 (1958). Petitioner represented Boomhower in al the legal actions described above. Two *26 other attorneys were associated with him on a contingent fee basis in the petition for writ of certiorari in the American Automobile Insurance Company case. On other attorney was associated with him on a partial contingent fee basis throughout the D. W. Boomhower case. Two other attorneys were associated with him on a contingent fee basis in the H. G. Fischer & Co., Inc., case. Petitioner noted on his certificate for 75 shares of Boomhower common stock "Cancelled T. G. Benton Pres." The notation was not dated and the stock certificate book of the corporation was not offered in evidence. Petitioner testified that the stock was canceled in 1955. On his income tax return for 1955 he listed as a business deduction the $7,500 that he originally paid for his Boomhower stock, with the explanation: "Loss: On Guarantee of payment of debt of Boomhower, Inc., of which taxpayer was an officer, director and stockholder." In his notice of deficiency respondent determined that the $7,500 petitioner originally paid for his Boomhower stock was not deductible in 1955 because petitioner had failed to substantiate the loss and because he had failed to prove it deductible under sections 162, 165, 166, *27 212, or any other section of the Internal Revenue Code of 1954. During the years 1947 to 1949, petitioner was legal counsel to Russell Maguire (hereinafter referred to as Maguire), an oil and gas operator or wildcatter. Upon the termination of this relationship, Maguire requested petitioner to bring to his attention any attractive opportunities for investment in oil and gas properties of which petitioner became aware. According to petitioner, Maguire promised that, in the event he acquired any properties that petitioner brought to his attention, he would take care of petitioner with "a proper interest, meaning an interest in the leaseholds themselves either by way of a carried working interest or a royalty interest known as an overriding royalty, over and above the usual 1/8 royalty interest, or perhaps a net profit interest." During the years 1949 through 1953, petitioner brought to Maguire's attention various oil and gas lease offerings. Sometime in 1952 or 1953 he brought to Maguire's attention an offering of leases being made by Francis M. Blair (hereinafter referred to as Blair). Among the leases being offered by Blair were some known as the Dooley Scanlong leases. Without *28 petitioner's knowledge, Maguire acquired the Dooley Scanlong leases from Blair in June or July 1953 and upon drilling thereon discovered a valuable oil filed. When petitioner learned of these facts he asked Maguire to assign him an interest in these leases. Maguire denied petitioner's request and refused to make any other settlement with him. In late 1953 petitioner filed a complaint against Maguire in the United States District Court for the District of Connecticut alleging four causes of action. In the first he alleged breach of a contract - made on and after September 8, 1949 whereby defendant [Maguire] promised plaintiff [petitioner] that in consideration of plaintiff bringing to defendant's attention persons having promising opportunities for the drilling of oil wells on oil leases and for the acquisition of oil leases, which plaintiff agreed to do, defendant would, in the event he should make any transactions with such persons or through information supplied by them, insure to plaintiff that plaintiff would be compensated generously by participations in the said properties. Plaintiff performed, and defendant agreed with Francis M. Blair, who was produced to defendant *29 by plaintiff, to drill certain oil wells on leases owned or controlled by Blair, and acquired through Blair and his associates numerous oil leases, and omitted to provide generous participation for plaintiff, and thus breached his contract with plaintiff; * * * In the second count petitioner alleged that Maguire had tortiously induced Blair to breach and terminate a joint venture agreement he had with petitioner. In the third he alleged that Maguire had slandered him in the presence of Blair and others. In the fourth he sought compensation for legal services rendered Maguire in connection with prior litigation in which Maguire had been involved. Petitioner prayed for judgment in the amount of $500,000 for each of the first three alleged causes of action and $18,147.55 for the fourth. This suit was settled by the parties before trial. On March 16, 1955, petitioner signed two receipts, one acknowledging receipt of a check from the Russell Maguire oil account for $15,000, and the other acknowledging receipt of a check from the Russell Maguire oil account for $8,000. The receipt for the $15,000 check stated that petitioner accepted that check, subject to collection, in full payment *30 for all services (other than professional services as a lawyer, for which I [petitioner] have been fully compensated) and in full settlement of all claims for services rendered by the undersigned [petitioner] to Russell Maguire from September 8, 1949, to the date hereof, and for any expenses incurred or claimed to have been incurred in connection with his oil and gas business for which the undersigned has not previously received compensation, with the exception of services rendered or claimed to have been rendered, or expenses incurred or claimed to have been incurred in connection with negotiations or transactions with Francis M. Blair or persons introduced to Russell Maguire or claimed to have been introduced to Russell Maguire by the said Francis M. Blair. The receipt for the $8,000 check stated that petitioner accepted that check, subject to collection, in compromise and settlement of my [petitioner's] claim for damages for alleged breach of contract, as against Russell Maguire on account of all services rendered by the undersigned to Russell Maguire from January, 1950, to the date hereof, and for any expenses incurred or claimed to have been incurred during said period, *31 in connection with any and all past or future negotiations or transactions between Russell Maguire and Francis M. Blair or between Russell Maguire and persons introduced to him or claimed to have been introduced to him by or through the said Francis M. Blair in connection with the oil and gas business of Russell Maguire, without prejudice to any rights I [petitioner] may have against Francis M. Blair. Petitioner reported the proceeds of the two checks he received from Maguire in 1955 as receipts from his business or profession on his tax return for 1955. [2] In his petition to this Court he claimed that the $22,475 was a long-term capital gain from the sale of his interest in oil leases. Respondent denied the allegation. Opinion The first issue arises from respondent's determination that $500 of the $8,124.86 deducted by petitioner on his return for 1955 as expenses of his business or profession was not deductible because it was not substantiated and because it was not a deductible expense of *32 the petitioner. Petitioner contends that this determination is improper because respondent failed to identify the items disallowed, thereby making it impossible for petitioner to prove the incorrectness of the determination. We are not impressed by petitioner's arguments on this issue. At the opening of the trial of this proceeding counsel for respondent stated that the $500 disallowed constituted respondent's estimate of that portion of the office expenses included in the $8,124.86 business expenses claimed on the return that was allocable to Petroleum Financial Corporation. In his petition to this Court, petitioner stated that he believed the arbitrary amount of $500 disallowed included expenses of maintaining a corporate vehicle for possible use of petitioner, and expenses of the corporation incurred by petitioner for his benefit. It also seems apparent from petitioner's own statements that he had previously been advised of the basis for respondent's disallowance of this item. The only evidence introduced on this issue was petitioner's testimony that included in the $8,124.86 deduction were expenditures, in an unspecified amount, that he had made on behalf of the Petroleum Financial *33 Corporation, a corporation which he and his wife controlled. Ordinarily an individual taxpayer who makes expenditures for the benefit of a corporation cannot deduct those expenses on his individual tax return. Deputy v. du Pont, 308 U.S. 488 (1940); Jacob M. Kaplan, 21 T.C. 134 (1953); Andrew Jergens, 17 T.C. 806 (1951); Hal E. Roach, 20 B.T.A. 919 (1930). We cannot accept petitioner's argument that because he expected to earn legal fees by representing the corporation he is entitled to deduct expenses he paid for the corporation. Such are not ordinary and necessary business expenses of a lawyer. And even if the claim had been raised in the pleadings, which it was not, we do not agree with petitioner that he should be allowed a bad debt deduction in the amount of $500 for advances made to Petroleum Financial Corporation. There is no evidence of the amount of such advances or of the corporation's inability to pay, and such a claim is entirely extraneous to the issue here involved. It was incumbent upon petitioner to prove either that respondent's *34 estimate was incorrect, which he has made no effort to do, or that the total $8,124.86 was deductible as an ordinary and necessary expense of conducting petitioner's business, which he has failed to do. Decision on this issue is for respondent. The second issue involves petitioner's right to deduct $7,500 as the result of canceling his 75 shares of common stock in Boomhower. The facts with respect to this issue are set out in detail in our findings and will not be repeated here. On his tax return for 1955, petitioner deducted as a loss incurred in his business or profession the $7,500 he originally paid for the Boomhower stock, with the explanation: "Loss: On Guarantee of payment of debt of Boomhower, Inc., of which taxpayer was an officer, director and stockholder." In his notice of deficiency respondent disallowed this deduction for the reason that petitioner had failed to substantiate it and had failed to prove it was deductible under sections 162, 165, 166, 212, or any other section of the Internal Revenue Code of 1954. In his original petition, petitioner alleged that the characterization of the deduction in his return was a misnomer, and that it was a loss on a transaction *35 entered into for profit and was unconnected with his profession as a lawyer. By an amendment to the petition filed at the opening of the trial, the allegation in the original petition that the $7,500 was unconnected with petitioner's profession as a lawyer was stricken and substituted in place thereof was an allegation that the $7,500 was a loss sustained in petitioner's business as an investment counselor, business advisor, and lawyer; or in the alternative, that the loss was a nonbusiness bad debt deductible under section 166(d)(1); or in the alternative, that the loss was an ordinary and necessary expense incurred in 1955 for the production or collection of income consisting of fees expected to be earned as a lawyer in the prosecution of valuable claims on behalf of Boomhower. Respondent does not contest that petitioner incurred a loss with respect to his Boomhower stock but he contends that this loss was neither incurred nor deductible in 1955. We think respondent's determination must be sustained. Petitioner's loss under whatever section of the Code it is considered, must be shown to have been incurred in 1955, which seems to hinge entirely on the validity of his purported obligation *36 to surrender his Boomhower stock in 1955 and his actual cancellation thereof in that year. It is abundantly clear from the evidence that the stock became worthless in 1952 at the latest unless the claims upon which the various lawsuits were based left a breath of life in the corporation after it ceased doing business and sold all its assets. If the claims were of sufficient value to give petitioner's stock some value in 1955, it retained that value until the various lawsuits were finally terminated adversly to Boomhower, the last of which occurred in 1958. So petitioner necessarily relies on the surrender of his stock in 1955 as the identifiable event which fixed his loss in that year, which incidentally was the same year in which he settled his personal claims against Maguire for $23,000. The only evidence offered to support petitioner's contention in this respect was the letter written by him addressed to the Robinsons bearing the date March 1, 1951, his stock certificate marked "Cancelled T. G. Benton Pres.," and his own testimony that he canceled his stock in 1955 pursuant to the obligation in the letter. Even if we accept this as proof of the fact that petitioner actually surrendered *37 and canceled his stock in 1955, which we would be reluctant to do in the absence of better evidence which should have been available, such would appear to be merely a self-serving gesture. Petitioner contends his letter to the Robinsons was a binding agreement which obligated him to cancel his stock if Boomhower did not repay the advances made to it by the Robinson trust by 1955. As far as we know, the Robinsons were never even aware of this letter. Petitioner counters with the statement that the agreement was between himself as an individual and himself as trustee for the Robinsons. This is belied by the fact that the letter is addressed to the Robinsons personally. Furthermore, as we understand the letter, there was no promise therein to cancel petitioner's stock but only the promise that he would surrender it to the Robinsons or the corporation as collateral for the advances. Such a promise would also seem to have been an empty gesture in view of the fact that petitioner's stock would have had no value until after the advances were repaid by Boomhower. The general requirement that losses *38 be deducted in the year in which they are sustained calls for a practical, rather than a legal, test. Lucas v. American Code Co., 280 U.S. 445 (1930). All pertinent facts and circumstances should be considered by the trier of the facts and he should not be confined to the taxpayer's beliefs and actions. Boehm v. Commissioner, 326 U.S. 287 (1945). We do not think the evidence in this record will support a finding that petitioner's loss with respect to his Boomhower stock was sustained in the year 1955. Boomhower sold all its assets and discontinued its business in September 1952. The corporate balance sheet as of September 30, 1952, showed corporate liabilities, exclusive of capital stock, to exceed the capital assets by $8,233.50. To attribute any value to petitioner's stock after 1952, and more particularly in 1955, by virtue of the claims which he was then prosecuting on Boomhower's behalf, would, in our opinion, be untenable guesswork. As a matter of fact, none of the claims produced anything for Boomhower, but that was not a certainty at the beginning of 1955. However, the maximum value placed upon these claims in the record was the $30,000 figure *39 mentioned by petitioner in his testimony: "the three cases had a value of at least $30,000 as a minimum and if settlement had been discussed for all of them as a whole, I would have expected a settlement of at least $30,000." Even if we were to assume that these claims had a value of $30,000 in 1955, we still would be unable to find as a fact that petitioner's stock had any value in that year. As of September 30, 1952, Boomhower's liabilities, exclusive of capital stock, exceeded its assets by the sum of $8,233.50. Among those assets was $5,749.17, representing advances to salesmen, which was never fully recovered by the corporation. By the beginning of 1955, suit had been filed on two of the three alleged claims; outside counsel had been retained on a contingent fee basis to assist petitioner in the prosecution of these suits. In one of the suits a third party's claim had been filed against Boomhower. There must have been considerable expense involved in prosecuting the suits. There is reason to believe that Boomhower owed taxes to the State of Delaware in view of the stipulation that its charter was revoked by that State in 1956 for failure to pay taxes. And finally, at the beginning *40 of 1955, Boomhower had outstanding 75 shares, par value $100 per share, of cumulative preferred stock. Cumulative preferred stock is generally accorded preferential treatment upon corporate distributions and although there is no evidence in the record as to the rights of the cumulative preferred stock in this case, we think its existence must be considered in determining whether the common stock had any value. We think the statement made by Judge Swan in his opinion in Mahler v. Commissioner, 119 F. 2d 869, 872 (C.A. 2, 1941), certiorari denied 314 U.S. 660 (1941), is most appropriate here: The taxpayer cannot be an "incorrigible optimist" in postponing the time for claiming a deduction based on the worthlessness of stock. Keeney v. Commissioner, 2 Cir., 116 F. 2d 401, 402. Nor can he postpone the date in a manner which amounts to a manipulation of his deductions to suit his income. * * * We do not think petitioner has proved that his stock in Boomhower had any value at the beginning of the year 1955. Our inability to find that petitioner's *41 stock in Boomhower had any value in 1955, or that his loss on this stock occurred in 1955, requires us to deny him the deduction either as an ordinary and necessary business expense paid or incurred in the taxable year, sec. 162, or as a loss incurred in a trade or business, sec. 165(c)(1), or as a loss incurred in a transaction entered into for profit, sec. 165(c)(2), even if we felt there was merit in petitioner's claim that the cancellation of his stock in 1955, assuming a value therein at the beginning of the year, qualified as a deduction under any of the above sections of the Code, which we do not. Boehm v. Commissioner, supra; City Ice Delivery Co. v. United States, 176 F. 2d 347 (C.A. 4, 1949). We think petitioner's belated reliance on C. Doris H. Pepper, 36 T.C. 886 (1961), is misplaced. The situation here is more like that in Friedman v. Delaney, 171 F. 2d 269 (C.A. 1, 1948), where the deduction was denied, than like that in the Pepper case. Petitioner has not argued on brief the first alternative allegation in his amended petition, that the loss was deductible as a nonbusiness bad debt under section 166(d)(1), and *42 we assume he has abandoned it. In any event, no debt to petitioner has been established by the evidence. We decide this issue for respondent. On his income tax return for 1955 petitioner reported as ordinary income from his business or profession the sum of $22,475 received by petitioner from Maguire in connection with the settlement of claims the former had made against the latter. Petitioner now contends that his original characterization of this income as ordinary income was incorrect and that it actually constituted capital gain. Respondent determined that petitioner's original characterization of this income was correct. In his brief, petitioner seems to advance two grounds for his claim that the payments in question were in the nature of capital gains. The first is that, in substance, the settlement he had with Maguire was a sale or exchange by him of a capital asset, namely, a "right of ownership * * * to a 'carried interest' in the Dooley Scanlong oil and gas lease" which Maguire acquired from Blair in 1953, and therefore, under the rationale of Lyeth v. Hoey, 305 U.S. 188 (1938), and Margery K. Megargel, 3 T.C. 238 (1944), the payments in question *43 were entitled to capital gains treatment. The second is that he and Maguire were joint venturers and that, in substance, the settlement constituted a transfer by him to Maguire of his interest in that joint venture subject to capital gains treatment under section 741. We have carefully reviewed all the evidence offered by petitioner with respect to this issue. Our findings with respect to this evidence are set forth fully in our Findings of Fact. We do not feel the evidence supports the facts or the legal conclusions upon which the petitioner hypothesizes his contentions. It is well established that for purposes of taxation, the character of the proceeds of a lawsuit or the settlement of a contested claim is determined by the nature of the claims involved and the basis of the recovery. Ralph Freeman, 33 T.C. 323 (1959); Harry L. Booker, 27 T.C. 932 (1957); Margery K. Megargel, supra; Raytheon Production Corporation, 1 T.C. 952 (1943), affd. 144 F. 2d 110 (C.A. 1, 1944), certiorari denied 323 U.S. 779 (1944); *44 see Lyeth v. Hoey, supra. If the nature of the claim settled is the recovery of capital and the settlement constitutes, for tax purposes, a sale or exchange of a capital asset, then the amount received in settlement will be accorded capital gains treatment. Margery K. Megargel, supra; Rose Marie Reid, 26 T.C. 622 (1956); Albert J. Goldsmith, 22 T.C. 1137 (1954). If the nature of the claim is the recovery of something, which, if paid voluntarily in the first instance, would have constituted ordinary income to the petitioner, then the proceeds are taxable as ordinary income. Ralph Freeman, supra; Harry L. Booker, supra; Raytheon Production Corporation, supra. The burden of proving that the settlement payments in question were in the nature of proceeds from the sale or exchange of a capital asset was upon petitioner. Ralph Freeman, supra; Harry L. Booker, supra.We do not think he has carried that burden. We think the most plausible conclusion suggested by the evidence is that the payments in question constituted compensation for services rendered as a broker *45 in the oil and gas business and are taxable as ordinary income. Petitioner's complaint filed in his action against Maguire (Thaddeus G. Benton v. Russell Maguire, Civil Action No. 4689, in the United States District Court for the District of Connecticut) claimed (1) damages for breach of contract for failure on the part of Maguire to compensate him by participations in properties for bringing to him persons having promising opportunities in the gas and oil business, specifically Francis M. Blair; (2) damages for conspiring with Blair to breach and terminate petitioner's joint venture with Blair; (3) damages for slander; and (4) $25,000 as the fair and reasonable value of legal services rendered by petitioner to Maguire, of which Maguire had paid only $6,852.45. Petitioner signed two receipts or releases upon settlement of these claims, the one in the amount of $15,000 stating that it was in full payment for all services (other than legal) rendered by petitioner to Maguire in connection with his oil and gas business, excepting with Blair; and the other in the amount of $8,000 stating that it was in compromise and settlement of petitioner's claim for damages for alleged breach of contract *46 as against Maguire on account of services rendered in connection with the Blair negotiations. Petitioner's testimony was to the effect that the basis of his claim against Maguire was that he was not "compensated generously" for the part he played in the transactions between Maguire and Blair. The above evidence does not support petitioner's claim that he was a joint venturer or partner with Maguire. At best it indicates that Maguire promised petitioner to compensate him for bringing opportunities in the oil and gas business to him, and that petitioner's compensation therefor would be in the form of sort of a participating interest in wells drilled. This alone would not make petitioner and Maguire partners or joint venturers. Furthermore, Maguire did not transfer any such interest to petitioner and denied his obligation to do so. Petitioner never acquired any interest in a partnership or in an oil or gas venture which he could sell or exchange. Apparently, Maguire recognized some obligation to petitioner for compensation for services rendered and paid him cash for such services as indicated in the releases. But this does not prove that the cash Maguire paid petitioner was in exchange *47 for an interest owned by petitioner either in an oil and gas property or in a partnership. And, finally, we note that compensation for services rendered was apparently what petitioner considered the payments to be when he reported them as receipts from his business or profession on his income tax return for 1955. See Kaltreider v. Commissioner, 255 F. 2d 833 (C.A. 3, 1958), affirming 28 T.C. 121 (1957); White v. Commissioner, 172 F. 2d 629 (C.A. 5, 1949), affirming a Memorandum Opinion of this Court. Respondent's determination on this issue is sustained. In his petition the petitioner alleged that respondent erred in not allowing him the benefits of sections 1301 and 1303 with respect to the $23,000 settlement payment he received from Maguire in 1955. This allegation was made in the alternative to his allegation that this settlement payment constituted long-term capital gain. Respondent denied this allegation in his answer and neither party mentioned this issue at the trial of this proceeding or on brief. We assume petitioner has abandoned this issue but we do not think he could be sustained on it in any event. The evidence fails to prove *48 that the payment received qualifies as either compensation from an employment under section 1301 or income from back pay under section 1303. Decision will be entered under Rule 50. Footnotes
1. All section references herein will be to the Internal Revenue Code of 1954.↩
2. The return listed the $23,000 less an unexplained 2 1/2 percent "belonging to Robert and Mrs. Douglas," the resulting $22,475 being extended as total receipts from the business.↩