HIROTOSHI YAMAMOTO AND SHIZUKO YAMAMOTO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hirotoshi Yamamoto v. Commissioner
Docket No. 13280-85
United States Tax Court
T.C. Memo 1990-549; 1990 Tax Ct. Memo LEXIS 621; 60 T.C.M. (CCH) 1050; T.C.M. (RIA) 90549; October 23, 1990, Filed *621 Decision will be entered under Rule 155. Petitioner husband (H) was sole owner of the voting stock of MFC, an industrial loan company in Hawaii. Hawaii requires industrial loan companies to maintain a debt-to-capital ratio of ten-to-one. In years before the years in issue, H borrowed money and used the loan proceeds to buy more stock in MFC. In Yamamoto v. Commissioner, T.C. Memo. 1986-316, affd. without published opinion 891 F.2d 297 (CA9 1989), we held that deduction of H's interest payments on those loans was limited by the investment interest rules. H incorporated MEI, a holding company, on June 20, 1977. On June 28, 1977, in return for all of MEI's stock and a promissory note in the amount of $ 1,774,066, H transferred all of his MFC common stock to MEI. In June and August of 1981, H consolidated certain of his debts to MFC into three promissory notes totalling $ 1,646,795. On October 15, 1981, he assigned the $ 1,774,066 note from MEI to MFC in satisfaction of his debts. Held: (1) Certain of H's interest expenses are subject to the investment interest deduction limitations under section 163(d), I.R.C. *622 1954. Burden of proof. However, respondent's assertion of collateral estoppel is rejected. Held: (2) Petitioners realized income from the discharge of indebtedness when H used the $ 1,774,066 note to satisfy his debts to MFC, because the note was worthless. Sec. 61(a)(12), I.R.C. 1954. H guaranteed certain debts of one of his corporations to MFC. As part of the corporation's liquidation, H issued a note to MFC. (This was one of the debts consolidated in mid-1981; the note was discharged on October 15, 1981, in exchange for the MEI note.) Held: (3) Petitioners are not entitled to a bad debt deduction on account of H's guarantee, because H never paid on his guarantee. Secs. 166(a) and (b), I.R.C. 1954. H was a 50-percent owner of a partnership (P). P, on the cash basis, accrued interest on a debt it owed; P did not pay the interest. P lent money to others; the debts became worthless during 1981. P had interest expense. Held: (4) Petitioners are not entitled to deduct that portion of P's claimed loss attributable to the accrued but unpaid interest. (5) Petitioners are entitled to deduct that portion of P's claimed loss attributable *623 to the bad debt, but only as a nonbusiness bad debt. Sec. 166(d), I.R.C. 1954. Burden of proof. (6) Petitioners must treat as investment interest that portion of P's claimed loss attributable to P's interest expense. Burden of proof. Hirotoshi Yamamoto, pro se. Henry E. O'Neill, for the respondent. CHABOT, Judge. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in Federal individual income tax against petitioners for 1980 and 1981 in the amounts of $ 103,933 and $ 1,153,327, respectively. After a concession by respondent, [1] *630 the issues for decision are as follows: [2]
(1) Whether certain interest expenses of petitioners for 1981 are subject to the section 163(d) limitations on investment interest deduction. (2) Whether petitioners realized income from the discharge of indebtedness in 1981. (3) Whether petitioners are entitled to a bad debt deduction for 1980. (4) Whether petitioners are entitled *629 to a partnership loss deduction for 1981, the components of the loss being (a) the partnership's accrued but unpaid interest, (b) the partnership's bad debts, and (c) the partnership's asserted investment interest. FINDINGS OF FACT [3]
*631 Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, petitioners Hirotoshi Yamamoto (hereinafter sometimes referred to as "Yamamoto") and Shizuko Yamamoto, husband and wife, resided at Waianae, Hawaii. Petitioners were cash basis taxpayers for both years in issue. Yamamoto is an insurance agent and salesman. Yamamoto also was licensed as a general building contractor from July 1, 1958, until May 1, 1986, when his license was placed on inactive status. MFC and MEI -- In General
In 1960, Yamamoto and two others incorporated Manoa Finance Company (hereinafter sometimes referred to as "MFC") under Hawaii law as an industrial loan company. Until 1977, Yamamoto owned all the common stock of MFC. Industrial loan companies in Hawaii make loans and issue interest-bearing thrift certificates to savers. Hawaii closely regulates industrial loan companies, and prohibits them from having outstanding at any time debentures or loan certificates in excess of ten times the amount of paid-up capital and surplus. Hawaii Rev. Stat. sec. 408-14(c). [4]
*632 On June 20, 1977, Yamamoto incorporated Manoa Enterprises, Inc. (hereinafter sometimes referred to as "MEI"), a holding company, under Hawaii law. When Yamamoto incorporated MEI, he was the sole shareholder of the voting, common stock of MFC. His basis in MFC common stock as of that date was $ 2,772,066. By letter agreement dated, accepted, and effective June 28, 1977, Yamamoto transferred all of his MFC common stock to MEI. In return, Yamamoto received all of the stock of MEI (99,800 shares) with an assigned value of $ 998,000. At the same time, Yamamoto paid $ 2,000 to MEI and MEI gave to Yamamoto an unsecured promissory note (hereinafter sometimes referred to as "the MEI note") in the face amount of $ 1,774,066. The MEI note bore an interest rate of 6 percent and provided for no payment of principal or interest until the expiration of the 10-year term (on June 28, 1987), at which time the principal and accumulated interest were due in full. Investment Interest Deduction
In earlier years (i.e., before 1980), Yamamoto had borrowed money and used the proceeds of the loans to buy more stock in MFC. [5] Yamamoto bought the stock to help MFC meet Hawaii's debt-to-capital *633 requirements for industrial loan companies. On their income tax returns, petitioners deducted $ 105,810.56 for 1980, and $ 73,943.81 for 1981 as interest paid on business indebtedness as part of Yamamoto's Schedule C contracting business. In the notice of deficiency, respondent determined that for 1980, petitioners were entitled to an additional deduction of $ 13,234.[6] *634 For 1981, respondent determined that petitioners were entitled to $ 14,054 less than they claimed. [7]
Discharge of Indebtedness Income
*635 In 1981, Yamamoto executed three promissory notes in favor of MFC, representing a consolidation of amounts that he owed to MFC, more fully described below. The total amount of the three notes was $ 1,646,794.52. The three components of Yamamoto's debt to MFC of $ 1,646,794.52 are as shown in table 1. Table 1
a.
the
$   408,811.29 note
b.
the
218,490.39 note -- Makaha Reef
c.
the
1,019,492.84 liability -- T-Y Partnership
$ 1,646,794.52 a. The $ 408,811,29 Note
Yamamoto executed a promissory note to MFC in the principal amount of $ 408,811.29, dated August 7, 1981 (hereinafter sometimes referred to as "the $ 408,811.29 note"). The $ 408,811.29 note was nonrecourse, bore a simple interest rate of 6 percent, was due on June 28, 1987, and did not provide for payments of principal or interest until that date, at which time the principal and accumulated interest were due in full. (See n.3, supra.) The principal sum of the $ 408,811.29 note was made up of various notes by third parties who had executed promissory notes to MFC on various dates, which notes were assumed by Yamamoto on July 2, 1981. Six of these assumed *636 notes, with remaining balances aggregating $ 259,500, bore interest at 10 percent. The money that had been borrowed from MFC in connection with these notes had been transferred by the borrowers to Yamamoto. Another $ 97,911.29 resulted from a sale of property by Yamamoto. Through a series of transactions, MFC acquired Yamamoto's rights in the sale transaction. The buyer paid off his remaining obligations to an escrow service, which applied the funds to pay off mortgages on real property owned by Yamamoto. This application of the escrowed funds for Yamamoto's benefit gave rise to Yamamoto's debt to MFC. The remaining $ 51,400 arose from MFC's payment of Yamamoto's liability in that amount to Great Hawaiian Realty. b. Makaha Reef Transaction
Yamamoto and Sakai Takahashi (hereinafter sometimes referred to as "Takahashi") were each 50-percent shareholders in Makaha Reef, Incorporated (hereinafter sometimes referred to as "Makaha Reef"). Makaha Reef was incorporated in 1965 and listed its principal business activity as a developer of real estate. The corporation was the owner of unimproved development real properties in Makaha, Hawaii. On June 30, 1981, when MFC was *637 foreclosing on Makaha Reef, Yamamoto and Takahashi transferred Makaha Reef's assets to MFC. On that date, Makaha Reef's adjusted basis in these assets was $ 2,054,478.03. Its liabilities amounted to $ 2,491,458.80, of which $ 1,467,918.83 was due to MFC. Makaha Reef's paid-in capital totaled $ 5,000, of which Yamamoto provided $ 2,800. After the transfer, Yamamoto and Takahashi, as guarantors of Makaha Reef's notes to MFC, still owed $ 436,980.77 to MFC (liabilities of $ 2,491,458.80, less assets basis of $ 2,054,478.03). Yamamoto executed a promissory note dated June 30, 1981, to MFC for $ 218,490.39 (hereinafter sometimes referred to as "the $ 218,490.39 note"), which represented his 50-percent share of the balance he and Takahashi owed to MFC after the transfer. [8]
On the same day, MFC cancelled Makaha Reef's indebtedness to MFC, and assumed Makaha Reef's other liabilities in the amount of $ 1,023,539.97. *638 In 1981, Makaha Reef was dissolved. On October 15, 1981, the $ 218,490.39 note was treated as "paid" through a series of assignments and adjustments, explained in greater detail below. No new funds were paid in to MFC. Petitioners' amended 1980 tax return reflects a deduction of $ 218,490 as a business bad debt, which deduction was disallowed in its entirety by respondent in the notice of deficiency. c. Partnership Transaction
The third component of the $ 1,646,794.52 liability to MFC stems from a transaction involving a partnership (hereinafter sometimes referred to as "the T-Y Partnership"), a cash basis entity which Yamamoto and Takahashi formed sometime in the 1960's. The T-Y Partnership was engaged in developing properties. The T-Y Partnership lent money to Makaha Reef between October 1977, and March 1980. Also, the T-Y Partnership borrowed money from MFC and a corporation known as Manoa Investment Company over a period of years. The T-Y Partnership's borrowings were evidenced by notes signed by the partners, both of whom were personally liable. On June 30, 1981, MFC assumed certain liabilities of the T-Y Partnership and cancelled certain indebtedness owed *639 by the T-Y Partnership to MFC. The amount of the loan cancelled was $ 839,689.72 and the liabilities of T-Y Partnership assumed by MFC totaled $ 747,709.63. In return, the T-Y Partnership transferred certain property to MFC, which MFC valued on its books at $ 486,396.89, creating a shortfall to MFC of $ 1,101,002.46 ($ 839,689.72 loan cancellation, plus $ 747,709.63 assumed liabilities, less $ 486,396.89 property transfer). Yamamoto executed a promissory note dated June 30, 1981, to MFC for half that amount, namely $ 550,501.23 (hereinafter sometimes referred to as "the $ 550,501.23 note"). The $ 550,501.23 note was nonrecourse, bore a simple interest rate of 6 percent, was due on June 28, 1987, and did not provide for payments of principal or interest until that date, at which time the principal and accumulated interest were due in full. (See n.3, supra.) Also, Yamamoto agreed to pay Takahashi's share of the shortfall, amounting to $ 468,991.61 ($ 550,501.23, less credit for payments made by Takahashi). [9] The total amount of liability from Yamamoto to MFC in connection with this last series of transactions was $ 1,019,492.84 (the $ 550,501.23 note and the $ 468,991.61 Takahashi *640 share). See table 1, supra. d. Transfer of MEI Note; Later Events
On October 15, 1981, Yamamoto assigned the MEI note ($ 1,774,066) to MFC in full payment and satisfaction of those of his liabilities to MFC ($ 1,646,794.52) which are described above. (See table 1, supra.) At the time of the assignment, MEI's only assets were (1) about $ 500 in a bank account and (2) the stock of MFC. Before the assignment, no payments of interest or principal had been made on the MEI note. Yamamoto also directed a series of accounting entries dated October 15, 1981, whereby MEI's obligation to *641 MFC was ostensibly satisfied based upon a write-up of the value of real estate held by MFC. On September 30, 1982, Hawaii bank examiners and the Department of Consumer Affairs directed the reversal of the October 15, 1981, series of entries, with one exception: the bank examiners let stand the entry showing that Yamamoto's above-described obligations to MFC had been satisfied by the assignment of the MEI note. On February 9, 1983, Hawaii placed MFC into receivership for violating the debt-to-capital requirements under Hawaii law governing industrial loan companies. On February 10, 1983, Yamamoto filed a petition in bankruptcy for MFC under Chapter 11 of the Bankruptcy Code. The accounting firm of Alexander, Grant & Co. (hereinafter sometimes referred to as "Alexander, Grant"), at the request of the bankruptcy trustee, prepared a report and concluded that as of February 9, 1983, MFC's deficit in stockholders' equity was $ 16,838,359. [10] Alexander, Grant's report on MFC's financial statement states as follows: As instructed, we did not perform sufficient audit procedures relating to: Propriety of valuation of any assets. Verification of the cost of property and equipment. *642 Verification of basis of investments in partnerships. Determination of the propriety of profit recognition of real estate sales. Determination of the consistent application of accounting principles used in the preparation of the accompanying consolidated balance sheet. Evaluation of legal action against MFC as a general partner in 1160 Ala Napunani Associates (note L3). Propriety of certain cash transactions with stockholder in prior years. The following significant uncertainties affect the Company: 1. As discussed in note B4, the Company intends to dispose of its property and equipment. At present, ultimate realization is not determinable. 2. As discussed in note L3, MFC is involved in numerous legal actions. At present, the ultimate outcome of these actions is not determinable. Because of the limitations on the scope of our examination and the uncertainties, all described above, we are unable to express an opinion on the statement referred to above. *643 A second examination, by Peat Marwick, Mitchell & Co. (hereinafter sometimes referred to as "Peat, Marwick"), concluded that as of December 31, 1983, MFC's deficit in stockholders' equity was $ 13,705,653. [11] Peat, Marwick's report on MFC's financial statement concludes as follows: At your request, we did not perform certain audit procedures relating to: Verification of the cost of property and equipment. Verification of basis of investments in partnerships. Determination of the propriety of profit recognition of sales on real estate acquired in prior years. Determination of the consistent application of accounting principles used in the preparation of the accompanying consolidated balance sheet prior to February 9, 1983. Propriety of certain cash transactions with stockholder in prior years. Manoa Finance Company, Inc. intends to dispose of its property and equipment as described in note 2. At present, ultimate realization is not determinable. Additionally, the Company is involved in numerous legal actions as described in note 10. The ultimate outcome of these actions is also not determinable. Because of the limitations *644 in the scope of our examination and the uncertainties described in the preceding paragraphs, we are unable to and do not express an opinion on the aforementioned consolidated balance sheet of Manoa Finance Company, Inc. and subsidiaries as of December 31, 1983. The accompanying consolidating financial information has been subjected to the same auditing procedures; we do not express an opinion on them for the reasons stated in the preceding paragraph. On December 16, 1983, the bankruptcy trustee instituted an adversary bankruptcy proceeding against Yamamoto and others. The bankruptcy trustee *645 sought to impose liability on Yamamoto, specifically, for the three obligations totalling $ 1,646,794.52 (see table 1, supra), characterizing Yamamoto's actions as frauds against MFC. The three promissory notes were dealt with in counts III, V, and VI of the complaint in the bankruptcy proceeding. On June 26, 1984, the bankruptcy trustee moved for partial summary judgment against Yamamoto on counts VIII and XVII of the complaint. Count VIII was based on promissory notes by Yamamoto to MFC aggregating $ 978,497.12, and executed by Yamamoto during the period December 30, 1968, to December 31, 1975. Count XVII was based on promissory notes by Japan Center Car Wash, Inc., to National Braemar, Inc., in amounts of $ 151,499.83 and $ 19,885.25. Yamamoto assumed the liabilities of Japan Center Car Wash, Inc. National Braemer, Inc., assigned the promissory notes to MFC. On November 19, 1984, the Bankruptcy Court granted the motion for partial summary judgment against Yamamoto on counts VIII and XVII in the total amount of $ 1,666,309.20 (including interest up to October 15, 1984). Both the Alexander, Grant report and the Peat, Marwick report show $ 1,646,794 (or 5) as an account *646 receivable from MEI; neither report shows as receivables from Yamamoto any of the notes or liabilities described in table 1, supra. * * * On October 15, 1981, when Yamamoto assigned the MEI note to MFC in full payment and satisfaction of certain of his liabilities to MFC, the MEI note had a fair market value of $ 0. OPINION The record in instant case reflects a bewildering series of transactions, some of which may or may not have had a basis in reality. The one thread that seems to be present in most of the transactions is that they were motivated by Yamamoto's desire to keep MFC afloat. Because MFC was in such poor financial health, and because he was trying to meet Hawaii's debt-to-capital requirements, Yamamoto took steps to increase MFC's capital. [12] These capital infusions seem to have consisted, in significant part, of (1) circular money transfers (MFC lent funds to third parties, who then lent the funds to Yamamoto, who then contributed the funds to MFC; see discussion of the $ 408,811.29 note in n.19, infra) and (2) a flurry of promissory notes that were exchanged between Yamamoto and entities (MFC, MEI, Makaha Reef, and the T-Y Partnership) over which he *647 had partial, or total, ownership or control. In most instances, the notes were not followed by actual payments. As we have stated (see n.3, supra), petitioners have had several opportunities to acquaint themselves with the Rules of this Court. Furthermore, we urged petitioners to seek the assistance of counsel in this case. Thus, we believe that petitioners must be held responsible for their sometimes conflicting arguments, and for the muddle that they created with their expert witness' testimony, and their briefs and exhibits. Accordingly, we deal with each transaction as it has been presented by the parties, and we do not attempt to create a rationality that petitioners themselves have seemed to deny. As a preliminary matter, we note that respondent's determinations *648 as to matters of fact in the notice of deficiency are presumed to be correct, and petitioners have the burden of proving otherwise. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). However, respondent has the burden of proof with respect to his claim of collateral estoppel on the investment interest deduction issue, because it is an affirmative defense. Calcutt v. Commissioner, 91 T.C. 14, 20-21 (1988); Rules 39 and 142(a). I. Investment Interest Deduction -- Sec. 163(d)
We consider first whether petitioners' claimed business interest expenses are subject to the section 163(d) limitations on investment interest deductions. Section 163(d)[13] limits the deduction of otherwise deductible investment interest to no more than $ 10,000, plus certain additional amounts. The statute defines "investment interest" as "interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment." Sec. 163(d)(3)(D). The legislative history shows that the Congress intended to exempt from this limit interest on funds *649 borrowed for use in connection with a trade or business. H. Rept. 91-413, p. 73 (1969), 1969-3 C.B. 200, 246. *650 Petitioners contend in their petition that they borrowed the money to provide "necessary advances for the then survival of [MFC] under the State's Industrial Loan laws." (Emphasis in original.) On brief, they argue that (1) their 1980 [14] and 1981 tax returns show "predominantly active business * * * incomes, which overshadow dividends from [MFC]"; (2) MFC was the "catalyst" that made Yamamoto's "conglomerate business activities * * * possible"; and (3) the loans were made in order to enable Yamamoto to infuse more capital into MFC so that MFC would be better able to fill the "catalyst" role. (Emphasis in original.) By amended answer, respondent contends that the doctrine of collateral *651 estoppel prevents petitioners from further litigating in this Court whether the disputed interest constitutes investment interest under section 163(d). Respondent asserts that this issue was raised and adjudicated under similar facts in an action in this Court between the same parties involving different tax years ( Yamamoto v. Commissioner, T.C. Memo. 1986-316, affd. without published opinion 891 F.2d 297 (CA9 1989), relating to 1978 and 1979), and that petitioners have chosen to make the same arguments in the instant case. Respondent also maintains that petitioners' payments to MFC were for investment rather than for business purposes. Respondent argues that petitioners cannot adopt MFC's trade or business as their own in an attempt to escape characterization of their interest payments as "investment interest" under section 163(d)'s limitations. Respondent further contends that MFC was not so integral to petitioners' other business activities that additional capital infusions to MFC were necessary to maintain the other activities. We agree with petitioners as to collateral estoppel; we agree with respondent as to the applicability of the investment *652 interest limitations on deductions. Collateral Estoppel
Collateral estoppel is used to preclude a party from relitigating an issue that the party previously litigated unsuccessfully in a different action. Montana v. United States, 440 U.S. 147, 153-154 (1979); Commissioner v. Sunnen, 333 U.S. 591 (1948); Meier v. Commissioner, 91 T.C. 273, 283 (1988), on appeal (CADC Jan. 24, 1989). The Supreme Court has set out a three-prong test for use of collateral estoppel: (1) whether the issues presented in the second case are in substance the same as those in the first case; (2) whether controlling facts or legal principles have changed significantly since the first judgment; and (3) whether other special circumstances warrant an exception to the normal rules of preclusion. Montana v. United States, 440 U.S. at 155. We have already noted that because this is an affirmative defense, respondent, who raised it, has the burden of proof on this issue. The investment deduction limitation issue was indeed raised in T.C. Memo. 1986-316. *653 Findings were made and there was a judicial determination with respect to that issue. However, respondent has failed to carry his burden of proof on the second prong of Montana's three-part test, as to whether controlling facts have changed significantly since the first judgment. The record in the instant case does not show when petitioners made the loans in the instant case, the dates or amounts of interest payments, or the purposes for which the loans in the instant case were used or needed. The record does not show whether any of these factual elements is significantly different from the corresponding element for the years in issue in T.C. Memo. 1986 - 316. Respondent has failed to prove that these controlling facts have not changed significantly from those involved in T.C. Memo. 1986-316. Accordingly, we conclude that, because the second prong of the Montana test is not met, respondent may not rely on the doctrine of collateral estoppel. [15] *654 Thus, we must make an independent examination of the facts in the instant case. [16]
*655 Investment Interest
We turn to the issue of whether the interest payments were for investment purposes, and thus subject to section 163(d)'s limitations. The issue is whether Yamamoto made the loan or loans for investment purposes or for business purposes. For example, if Yamamoto used the loan proceeds to acquire an asset with sufficient investment intent to result in a capital gain or loss on its disposition, then interest paid on a loan to acquire the asset is investment interest. See Miller v. Commissioner, 70 T.C. 448, 4.55 (1978). On the other hand, if Yamamoto used the loan proceeds to acquire an asset and retained the asset for 24 reasons "devoid of substantial investment intent," then the asset is considex-ed to have been held for purposes other than investment. See Miller v. Commissioner, supra.The extent to which business-oriented considerations motivated Yamamoto in making the loan or loans is essentially a factual question. See Recklitis v. Commissioner, 91 T.C. 874, 907 (1988). As noted above, we have very little evidence on which to make our ruling. Both parties have chosen to argue this issue *656 as a continuation of T.C. Memo. 1986-316, without explaining the circumstances concerning the loans. Petitioners have the burden of proof on this issue. Petitioners have failed to carry their burden of proof. We conclude that respondent's determinations, both as to the investment status of the interest and the amounts of petitioners' allowable deductions (see nn. 6 and 7, supra) should be upheld. On brief, petitioners indicate that, in some manner, section 163(d)(5) supports their analysis. As in effect for the years in issue, [17]section 163(d)(5) provided that the investment interest limitations did not apply, if certain criteria were met, to indebtedness incurred before December 17, 1969, or (in general) pursuant to a commitment that bound the taxpayer on and after December 16, 1969. *657 In our opinion in T.C. Memo. 1986-316, 51 T.C.M. 1560, 1564, 55 P.H. Memo T.C. par. 86,316 at 86-1390, we noted this statutory provision, and then stated as follows: We are unable to consider adequately these important issues without evidence of the refinancing agreement, without argument by petitioner on brief or at trial, and without mention of the issue in the pleadings. Petitioners have met neither their burden of going forward with evidence nor their burden of proof. Rules 34(b)(4), (5) and 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering, 290 U.S. 111 (1933); Helvering v. Taylor, 293 U.S. 507 (1935). The parties do not point us to, and we have not found any evidence in the record as to when any of the debts were incurred and how much of the interest is attributable to debts, the interest on which qualifies for exemption under section 163(d)(5). Respondent has made determinations in this regard (see nn. 6 and 7, supra), but he has, in effect, exempted all of the interest that he determined to be attributable to the older debt. Petitioners do not seem to contend that respondent *658 erred in his determinations or his calculations with regard to the interest thus exempted. Our reaction on the record in the instant case is the same as our reaction to the section 163(d)(5) issue in T.C. Memo. 1986-316. As for petitioners' argument that they had more active business income than MFC dividends in the years before the Court, and thus section 163(d) should not apply, petitioners do not direct us to any legal rationale to support their position, nor do we know of any. Under the circumstances, we do not address respondent's contentions (1) that petitioners are not entitled to adopt MFC's trade or business as their own for purposes of section 163(d), and (2) that MFC was not integral to petitioners' other business activities. We hold for respondent on this issue. II. Discharge of Indebtedness Income
Respondent determined that petitioners received $ 1,646,795 (evidently, the table 1 total, rounded) income from discharge of indebtedness in 1981. Respondent contends that Yamamoto received this income because, when Yamamoto assigned the MEI note (face amount of $ 1,774,066) to MFC in satisfaction of his own debt to MFC, the MEI note was worthless.
*659 Petitioners aver that at the time that Yamamoto assigned the MEI note to MFC, it was worth its full face amount. Petitioners argue that if this Court were to find that the MEI note was worth less than its face amount, then the MEI note was worth at least the amount of Yamamoto's debt. Petitioners contend that, in any event, Yamamoto's debts to MFC were not discharged until 1985, long after the years in issue in the instant case. We agree with respondent. Section 61(a)(12) provides that gross income includes income from the discharge of indebtedness. [18] *660 The parties agree that Yamamoto owed MFC $ 1,646,794.52. [19] The parties have stipulated that "On October 15, 1981, Yamamoto assigned to MFC the note from MEI to him in the principal amount of $ 1,774,066.00 in full payment and satisfaction of the aforesaid liability from Yamamoto to MFC in the amount of $ 1,646,794.52." Our findings follow this stipulation. The parties do *661 not consider whether income should not be realized because of doubts as to enforceability of Yamamoto's debts, or disputes as to his liability. See, e.g., Zarin v. Commissioner, 92 T.C. 1084 (1989), revd. F.2d (CA3 Oct. 10, 1990). Accordingly, we focus on the remaining issue of the dispute before us, the limited question of whether the value of the MEI note was less than the amount of Yamamoto's forgiven debts to MFC and, if so, what is the amount of the shortfall. The amount of the shortfall would be the amount of the discharge of indebtedness income. Kaplan v. Commissioner, 21 T.C. 134, 144-145 (1953). [20] We proceed to determine the fair market value of the MEI note. *662 Generally, the fair market value of property is the price at which a willing buyer will purchase the property from a willing seller, when neither is acting under compulsion and both are fully informed of the relevant facts and circumstances. McShain v. Commissioner, 71 T.C. 998, 1004 (1979). At trial, both sides presented the testimony of expert witnesses. The parties agree that the MEI note is in the face amount of $ 1,774,066. The parties have stipulated, and we have found, that, at the time of the assignment, MEI's only assets were (1) about $ 500 in a bank account and (2) the stock of MFC. If MEI were to be able to pay the MEI note, then either (a) MEI would have to get the wherewithal from MFC, or (b) MEI would have to use the MFC stock to borrow from others, or (c) MEI would have to sell the MFC stock. Under any alternative, MFC's condition would profoundly affect the value of the MEI note. Petitioners' expert, Alfred Au (hereinafter sometimes referred to as "Au"), has been a certified public accountant since 1955. Au audited MFC (an annual "limited general *663 audit") from its creation until 1982. Au describes his current activities as follows: a semi-retired, chief analyst for a corporation known as Ten-Fifty, Inc.; an "ad hoc public defender" in income tax cases; and being involved in research, publications, substitute teaching, and lecturing. Respondent's expert, Richard A. Lapides (hereinafter sometimes referred to as "Lapides"), is a certified review appraiser, and was employed by the Internal Revenue Service as an appraiser from 1979 until at least the time of the trial. He also worked as a real estate appraiser for a private company. He appraises eight to ten notes per year at respondent's request, and also values about six to eight notes per year in his private dealings. He has valued 150 to 200 notes, ranging in values up to $ 50,000,000. Before his employment with respondent, Lapides worked for 1 year with Dun and Bradstreet as a business analyst. Au testified that he valued the MEI note at cost. He would not acknowledge that, all other things being equal, the fair market value of a note would be affected by the interest rate on the note. Au testified that he did not think that concept is material to the instant case. *664 His position is epitomized by the following testimony. BY MR. O'NEILL: Q. Mr. Au, the questions that I have been directing to you where I've been using value, I should have been saying fair market value. Granting that, this clarification, would any of your answers have been different? A. No. I want to make another addition to that, is that intercompany transaction, cost is the only basis. That's my position. Q. Okay, but my question -- A. There's no consideration of fair market value or any other value. In the intercompany transaction between a holding company and a subsidiary, cost is the only basis. And that note was transferred at cost. Q. So, in your opinion, the fair market value of the $ 1.7 million note has nothing to do with -- is in essence irrelevant to the proceeding? A. Given the facts of the situation a transfer of a note from the holding company to the subsidiary, cost is the only basis. And I repeat that and stand on that statement. Au testified that he did not have enough expertise to decide whether a note with a 1-percent interest rate is worth the same as a note with an 18-percent interest rate, all other factors being *665 the same. Au testified that appraisals are used "only in determining estate taxes." Lapides explained his valuation process essentially as follows: At maturity (June 28, 1987), the face amount of the MEI note plus accrued interest (6 percent) would be $ 2,838,506. Lapides referred to this as "the future value (FV) of the [MEI note]." The question is, what would the market require, on October 15, 1981, for the right to receive this FV in about 5-3/4 years? This involves determining the appropriate discount rate ("internal rate of return (IRR) to the investor"), and then (because the MEI note was not secured) looking at the stability of the borrower. Firstly, Lapides pointed out that, on October 15, 1981, United States Treasury bonds with a 5-year maturity (about the same time to maturity as the MEI note) were yielding 15.63 percent "with virtually no risk at all". Also, he noted that the Treasury bonds were highly liquid; they "could be readily sold, almost by making a telephone call." Table 2 shows Lapides' construction of the discount rate on the MEI note as of October 15, 1981, as presented in his expert witness report. Table 2
Oct. 15, 1981
26 week T-Bill Rate
13.5%   Term Adjustment
+ 5.8    Frequency of Payments Adj.
+ 5.0    Security Position Adj.
+10.0    Commission/Admin. Expenses, etc.
+ 5.0    Misc. private corp., unaudited
+10-15   financial stmts., related 50-55%  parties dealings, etc.
*666 Lapides starts with the then-current 26-week Treasury bill rate as his base. The next item is 1 percent for each year then remaining in the term of the MEI note. The next item relates to the MEI note not requiring any payment of interest or principal before the end of the term. The next item relates to the MEI note not having any preferred position vis-a-vis other liabilities of MFC. The next item takes account of costs involved in purchasing such a note, if it were offered for sale generally. The final item relates to MEI being a private corporation, MFC's financial statements being unaudited, and the MEI note having originated in a nonarm's-length transaction. Lapides concluded that "based upon very strong financial statements of the underlying lender" the discount rate would be about 50-55 percent. This would produce an October 15, 1981, tentative fair market value of $ 130,000 to $ 170,000. Although MEI was the obligor, MEI's ability to pay was based on MFC's strength. Accordingly, Lapides then consulted MFC's financial statements. The financial statements for 1976, 1977, 1980, and 1981 were provided to Lapides. For 2 of these 4 years, the statements showed losses. *667 Lapides states that businesses such as MFC are expected to earn a 1.0 percent return on assets. In 1 of the 4 years MFC earned 0.9 percent. In the aggregate, over the 4 years MFC lost more than 4 percent on assets. Lapides states that businesses such as MFC are expected to earn about a 16-percent return on equity. In the best of the 4 years, MFC earned only 8.7 percent on equity. From the foregoing, Lapides concludes "that the subjet [sic] note could not be sold on the open market * * * and therefore the fair market value of the previously described note is zero (0)". Lapides testified that the Alexander, Grant and Peat, Marwirk reports, which Lapides had not seen until years after he had prepared his own expert witness report, strengthened the conclusions he reached in his expert witness report. We agree. Au's analysis does not provide us with any basis for disagreeing with Lapides' valuation. We conclude, and we have found, that the fair market value of the MEI note on October 15, 1981, was $ 0. Thus, petitioners received income from the discharge of indebtedness in the amount of $ 1,646,794.52 on that date. Petitioners argue that even if we find that there was a *668 discharge of indebtedness, it did not take place until 1985, when the bankruptcy trustee cancelled the outstanding MFC stock. Petitioners' contention founders on the following: (1) The parties stipulated that On October 15, 1981, Yamamoto assigned to MFC the note from MEI to him in the principal amount of $ 1,774,066.00 in full payment and satisfaction of the aforesaid liability from Yamamoto to MFC in the amount of $ 1,646,794.52. * * * [Emphasis added.] and we have so found. (2) Yamamoto directed a series of accounting entries reflecting the assignment. (3) Au testified (and we have found) that the State officials' reversal of the series of entries did not apply to the October 15, 1981, entry showing that Yamamoto's obligation to MFC had been satisfied by the October 15, 1981, assignment of the MEI note. We are satisfied that Yamamoto's obligation to pay $ 1,646,794.52 to MFC was discharged on October 15, 1981, as part of the transaction in which Yamamoto transferred the MEI note to MFC. For completeness, we note that the bankruptcy trustee's testimony, and certain stipulated documents, show that judgment in the bankruptcy proceeding was obtained *669 against Yamamoto in 1984 in the amount of $ 1,666,309.20, an amount remarkably similar to the $ 1,646,794.52 in dispute in this issue. However, these documents show that the 1984 judgment was for different debts that Yamamoto owed to MFC, and not for the debts that are the subject of the dispute before us. Petitioners do not contend that any part of the $ 1,646,794.52 was the basis of a judgment against Yamamoto or was paid by Yamamoto. At the trial, the Court informally brought to the parties' attention the question of whether Yamamoto had a basis in the MEI note, and if so, whether that basis should affect the tax treatment of Yamamoto's transfer of the MEI note to MFC. Petitioners do not contend that they are entitled to deduct, in either of the years before us, Yamamoto's basis in the MEI note. Nevertheless, we have given some thought to whether we should make some allowance to petitioners in light of the fact that Yamamoto clearly disposed of the MEI note in 1981. Firstly, we do not know what Yamamoto's basis was in the MEI note. Lapides is of the opinion that the MEI note was worthless when it was created, on June 28, 1977. In fact, his opinion is that, even if MFC's *670 finances were solid in 1977, the MEI note would have been worth only $ 20-35,000 at that time. Thus, all or substantially all of the basis involved in the 1977 transaction would have been allocated to the MEI stock and little or nothing to the MEI note. Secondly, we do not know whether there might have been an event before 1980 that would have affected Yamamoto's basis in the note. Thirdly, petitioners have not shown whether, if Yamamoto had any basis in the MEI note in 1981, that basis should be treated as an offset to petitioners' ordinary income or merely as giving rise to a capital loss, the deduction of which would be limited by section 1211. Accordingly, we have concluded that (1) we do not know how to resolve the question of Yamamoto's possible basis in the MEI note, (2) we are not convinced that petitioners have proven that respondent's determination is excessive ( Helvering v. Taylor, 293 U.S. 507 (1935)), or that petitioners would be entitled to at least some specific minimum offset or deduction ( Cohan v. Commissioner, 39 F.2d 540, 544 (CA2 1930)), and (3) it is possible that Yamamoto had no basis in the MEI note. We need not decide *671 a nonjurisdictional issue if it has not been presented by the parties, especially if evidence needed to decide the issue is not in the record. We leave the parties as we find them on this matter. See, e.g., Thomas v. Commissioner, 92 T.C. 206, 232 (1989); Concord Consumers Housing v. Commissioner, 89 T.C. 105, 106 n. 3 (1987); Parkey v. Commissioner, 16 B.T.A. 441, 450 (1929). In 1983, the bankruptcy trustee began an adversary bankruptcy proceeding against Yamamoto, seeking to impose liability for the $ 1,646,794.52 in debts to MFC. However, we cannot tell from the record whether this proceeding resulted in a judgment against Yamamoto on these debts. Nor does the record indicate whether Yamamoto made any payments to MFC as a result of a judgment in bankruptcy proceeding. Nor do petitioners contend that the bankruptcy proceeding operated in some manner to revive Yamamoto's debts to MFC. Finally, petitioners contend on brief that if -- there was indeed a discharge or cancellation of indebtedness there will still be no taxable income as a consequence. § 108. Income from discharge of indebtedness. (a) Exclusions *672 from gross income -- if -- (a) the discharge occurs in a title 11 (11 USCS §§ 101 et seq) case. [Emphasis in original.] Section 108(a)(1)(A)[21] does provide for nonrecognition if "the discharge [or indebtedness] occurs in a title 11 case". However, section 108(d)(2) defines "title 11 case" to include only those cases where the bankruptcy court has jurisdiction over the taxpayer and discharges the debt. Petitioners do not point us to, and we have not found, any evidence in the record in the instant case that Yamamoto was under the jurisdiction of the bankruptcy court or that his liabilities to MFC were discharged by the bankruptcy court. The entire structure of section 108, as well as the provision's legislative history (see, e.g., S. Rept. 96-1035, pp. 8-14 (1980), 1980-2 C.B. 620, 623-627), makes it plain that the provision operates to provide tax relief to the debtor in bankruptcy (in the present instance, MFC), and not to the debtor of the debtor in bankruptcy (e.g., in the present instance, Yamamoto). Accordingly, this argument, *673 too, gives no assistance to petitioners. *674 We hold for respondent on this issue. III. Bad Debt Deduction -- Makaha Reef
Before June 30, 1981, Yamamoto was a guarantor of Makaha Reef's notes to MFC. On that date, Makaha Reef's assets were transferred to MFC and Yamamoto issued a note to MFC (the $ 218,490.39 note) for half the amount by which Makaha Reef's liabilities to MFC exceeded Makaha Reef's net assets transferred to MFC. In 1981, MFC cancelled Makaha Reef's debts to MFC, and Makaha Reef was dissolved. On October 15, 1981, Yamamoto assigned the MEI note to MFC in full payment and satisfaction of the $ 218,490.39 note and two other notes. Section 166(a)(1)[22] allows deductions for wholly worthless debts. (No argument is made that any deduction is allowable in the instant case for a partially worthless debt, under sec. 166(a)(2), and so we do not consider the latter provision.) *675 Respondent contends that: (1) petitioners are not entitled to any deduction on account of Yamamoto's guarantee of Makaha Reef's liabilities, or on account of the $ 218,490.39 note, because Yamamoto did not pay on his guarantee or on the $ 218,490.39 note; (2) even if Yamamoto is treated as having paid, then no bad debt deduction is allowable because Yamamoto's payment is tantamount to a contribution to Makaha Reef's capital and not to a loan (however, in that event, respondent concedes that Yamamoto's payment would increase his basis in his Makaha Reef stock, that that stock was worthless in 1981, and that petitioners would be entitled to long-term capital loss deduction for 1981 on account of the worthless stock); (3) if Yamamoto is treated as having made a loan to Makaha Reef (instead of a contribution to capital), then any bad debt would be a nonbusiness bad debt and petitioners' deduction would be limited by section 166(d) (which provides for short-term capital loss treatment); and (4) in any event, no deduction is allowable for 1980, because "everything that could conceivably have given rise to a deduction occurred in 1981." Petitioners claim that the debt was not additional *676 capital or a loan to Makaha Reef, but rather Yamamoto's share of the foreclosure liability due to his endorsement of Makaha Reef's notes. Petitioners argue that they are entitled to a deduction for 1980 because that was the year in which Makaha Reef actually became unable to pay its debts; 1981 was only the year in which it officially could not pay. We agree with respondent that no deduction is allowable. a. Guarantor Transaction; Basis
When a taxpayer pays the debt of another because of the taxpayer's prior guaranty of the debt, the debtor's obligation to the original creditor becomes an obligation to the taxpayer, generally by reason of the law of subrogation. Putnam v. Commissioner, 352 U.S. 82, 85 (1956); Benak v. Commissioner, 77 T.C. 1213, 1218 (1981); Gillespie v. Commissioner, 54 T.C. 1025, 1031 (1970), affd. by unpublished order (CA9 1972). If the debtor cannot pay this shifted debt, which is not a new debt ( Putnam v. Commissioner, 352 U.S. at 88-89), then the shifted debt is treated as becoming *677 worthless at the time the taxpayer made the payment. Putnam v. Commissioner, 352 U.S. at 89; secs. 1.166-8(a)(1) and 1.166-9(a) and (b), Income Tax Regs.
Before petitioners may claim a bad debt deduction stemming from Yamamoto's liability as a guarantor of Makaha Reef's obligations, Yamamoto must first actually make a payment on the liability. Eckert v. Burnet, 283 U.S. 140 (1931). Secs. 1.166-8(b), 1.166-9, Income Tax Regs. Yamamoto merely executed a promissory note in 1981. This does not constitute payment. See, e.g., Don E. Williams Co. v. Commissioner, 429 U.S. 569, 578 (1977). On October 15, 1981, Yamamoto secured the satisfaction of the $ 218,490.39 note by transferring the MEI note to MFC. However, we have held that the MEI note's fair market value was $ 0 at that time. Thus, Yamamoto never parted with anything of value on account of his guarantee or on account of the $ 218,490.39 note. As a result, whether or not there ever was a bona fide debt from Makaha Reef to Yamamoto, Yamamoto never had a basis in the debt (sec. *678 166(b)[23]) and so no bad debt deduction is allowable. Perry v. Commissioner, 92 T.C. 470, 477-482 (1989), affd. 912 F.2d 1466 (CA5 1990). b. Other Considerations
For completeness, we briefly consider the other arguments made by the parties as to the Makaha Reef bad debt deduction. 1980 deduction. It is generally accepted that the year of worthlessness, of either stock (sec. 165(g)) or debts (sec. 166(a)), is to be fixed by identifiable events which form the basis of reasonable grounds *679 for abandoning any hopes of recovery. Crown v. Commissioner, 77 T.C. 582, 598 (1981); Scifo v. Commissioner, 68 T.C. 714, 725 (1977); Dallmeyer v. Commissioner, 14 T.C. 1282, 1291-1292 (1950). See Boehm v. Commissioner, 326 U.S. 287, 291-292 (1945). Au testified "Now, it is my recollection that the Makaha Reef owes the Banks, besides [MFC], so the loans and the banks called those loans in 1980." The record does not include evidence that Yamamoto and Takahashi satisfied their guarantor obligations in 1980, so there is no evidence that any debt arose (or was transferred) from Makaha Reef to Yamamoto in 1980. The record does not include evidence that any such debt from Makaha Reef to Yamamoto went bad in 1980. Thus, if any deduction was allowable, it would not be for 1980. Debt or capital contribution . Respondent determined in the alternative that the transaction was a contribution to Makaha Reef's capital, rather than a loan. See sec. 1.166-9(c)(2), Income Tax Regs. Apart from our finding that Makaha Reef's paid-in capital was only $ 5,000, we do not have information that *680 would enable us to decide this question on the basis of the evidence. Accordingly, if Yamamoto had paid on his guarantees, then it would appear that his payments would add to his basis in Makaha Reef's stock and would entitle him to a 1981 worthless stock deduction (we have found that Makaha Reef was dissolved in 1981) as a long-term capital loss, under section 165(g). However, Yamamoto did not pay anything of value on his guarantees, and so petitioners are not entitled to even that limited deduction. We hold for respondent on this issue. IV. Partnership Loss Deduction
For 1981, petitioners reported a loss of $ 263,445 as their distributive share of losses incurred by the T-Y Partnership. In the notice of deficiency, respondent allowed $ 3,117 and disallowed $ 260,328 of the claimed loss. The disallowed losses are from three separate components involving accrued interest, a bad debt, and an investment interest limitation. We will discuss the components seriatim. a. Accrued Interest Deduction
It appears that the accrued interest portion of the $ 260,328 disallowance amounts to $ 126,250. [24]
*681 Petitioners contend that the accrued interest owed by the T-Y Partnership to MFC was paid as part of Yamamoto's assignment of the MEI note to MFC. Respondent argues that because the partnership was a cash basis taxpayer, it cannot deduct accrued interest. Respondent also maintains that Yamamoto's assignment of the MEI note to MFC did not constitute payment. Respondent argues, in the alternative, that any otherwise allowable interest deduction would be limited by the investment interest provisions of section 163(d). We agree with respondent's primary position. For cash basis taxpayers, section 163(a) generally permits a deduction only for interest "paid" within the taxable year. The payment required to secure a deduction is the payment of cash or its equivalent; the giving of the taxpayers' note is not the equivalent of cash, but only a promise to pay. Don E. Williams Co. v. Commissioner, 429 U.S. at 578, 582-583; Battlestein v. Internal Revenue Service, 631 F.2d 1182, 1183-1184 (CA5 1980). See Heyman v. Commissioner, 70 T.C. 482, 485 (1978), *682 affd. 652 F.2d 598 (CA6 1980). Yamamoto and the T-Y Partnership were cash basis taxpayers. The accrued interest owed by the T-Y Partnership to MFC was not paid as part of Yamamoto's assignment of the MEI note to MFC because, as we have already determined, the MEI note was worthless when Yamamoto assigned it to MFC. Neither Yamamoto nor the T-Y Partnership ever paid any of the T-Y Partnership's relevant accrued interest. Therefore, the T-Y Partnership is not entitled to a deduction with respect to the interest and petitioners cannot claim a distributive share of this T-Y Partnership deduction. Also, Yamamoto's execution of a note in favor of MFC which includes the accrued interest does not permit petitioners to claim an interest deduction directly. We hold for respondent on this issue. b. Bad Debt Deduction
It appears that the bad debt portion of the $ 260,328 disallowance amounts to $ 116,033, arising from advances made by the T-Y Partnership to Makaha Reef between October 1977 and March 1980 (see n.24, supra). Respondent explicitly concedes "that the debt [from Makaha Reef to the T-Y Partnership] was worthless in 1981." We take this as implicit *683 concessions by respondent that (1) the debt was bona fide and (2) the debt became worthless in 1981. Respondent maintains that the bad debt is not a business bad debt, but rather is a nonbusiness bad debt and is thus deductible only as a short-term capital loss. Petitioners argue that Yamamoto was actively engaged in running the business of the partnership, and thus the debt was a business bad debt. Furthermore, petitioners argue that the loss was due to foreclosure action against Makaha Reef and the loss of the partnership's advances to Makaha Reef. We agree with respondent. Section 166(a) allows deductions for worthless debts. However, under section 166(d)[25] a nonbusiness bad debt is deductible by an individual only as a short-term capital loss. *684 To be treated as a business debt, the debt must be proximately related to the taxpayer's trade or business. Whipple v. Commissioner, 373 U.S. 193, 201 (1963); sec. 1.166-5(b), Income Tax Regs. The "proper measure [for such a relationship] is that of dominant motivation." United States v. Generes, 405 U.S. 93, 103-105 (1972); Shinefeld v. Commissioner, 65 T.C. 1092, 1096 (1976). Whether a debt is a nonbusiness or business debt is a question of fact. Sec. 1.166-5(b), Income Tax Regs.
Under sections 702(a)(1) and 702(b), and sections 1.702-1(a)(1) and 1.702-1(b), Income Tax Regs., the question of whether the T-Y Partnership's bad debt gives rise to a short-term capital loss is determined at the partnership level and the tax characterization thus determined is passed through to Yamamoto. See, e.g., Polakof v. Commissioner, 820 F.2d 321, 323 (CA9 1987), affg. a Memorandum *685 Opinion of this Court; [26]Drobny v. Commissioner, 86 T.C. 1326, 1341-1342 (1986); Brannen v. Commissioner, 78 T.C. 471, 502-505 (1982), affd. 722 F.2d 695, 703-704 (CA11 1984); Grove v. Commissioner, 54 T.C. 799, 803-805 (1970). Petitioners focus only on Yamamoto's being "actively involved in that partnership" (i.e., the T-Y Partnership). We have no deails of any of the T-Y Partnership's loans to Makaha Reef. We have no information that would enable us to conclude that the loans were made in connection with a trade or business of the T-Y Partnership (sec. 166(d)(2)(A)) or that the loss from the bad debt was incurred in a trade or business of the T-Y Partnership (sec. 166(d)(2)(B)). Petitioners have failed to carry their burden of proof. We hold for respondent on this issue. [27]
*686 c. Investment Interest Deduction
The remainder of the disallowed deductions consists of $ 18,045 for what respondent determined was investment interest. (See n. 24, supra.) Respondent avers that petitioners are not entitled to deduct this amount for 1981 because the limitations of sections 163(d) on investment interest deductions forbid it. Petitioners have failed to offer any evidence or analysis of this issue, and so they fail to meet their burden of proof. We hold for respondent on this issue. To reflect the concessions made by the parties and the conclusions reached herein, Decision will be entered under Rule 155. Footnotes
1. In the notice of deficiency, respondent determined that a 1981 $ 10,000 distribution from Makaha Laundry, Inc., an S corporation, did not constitute long-term capital gain. The theory was that the $ 10,000 was a recapture of depreciation under section 1245. In making this determination, respondent subtracted $ 10,000 from petitioners' reported capital gain income, but failed to make a corresponding addition to petitioners' ordinary income. Thus, the net effect was to reduce petitioners' taxable income by $ 4,396. Petitioners have chosen to contest respondent's determination, despite the fact that that determination works to their advantage. In his answering brief, respondent concedes the issue. That is, respondent concedes that petitioners correctly reported the $ 10,000 as long-term capital gain on their 1981 tax return. (More specifically, petitioners reported the $ 10,000 as a dividend on Schedule B, line 3, and then removed it from the dividend total by reporting it as a capital gain distribution on Schedule B, line 5. The capital gain distribution amount was then carried over from Schedule B, line 5, to Schedule D, line 13.) Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the years in issue; references to section 7430 are to that section for the date the petition was filed.↩
2. Petitioners also requested in the petition that the Court award them "$ 50,000.00 for cost of accounting and research services." Assuming that this is a claim for litigation costs under section 7430, such a request is not properly made in a petition. Rules 34, 231. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice & Procedure as in effect for the date the petition was filed.↩
3. Rule 151(e)(3) provides as follows: RULE 151. BRIEFS * * * (e) Form and Content: All briefs shall contain the following in the order indicated: * * * (3) Proposed findings of fact (in the opening brief or briefs), based on the evidence, in the form of numbered statements, each of which shall be complete and shall consist of a concise statement of essential fact and not a recital of testimony nor a discussion or argument relating to the evidence or the law. In each such numbered statement, there shall be inserted references to the pages of the transcript or the exhibits or other sources relied upon to support the statement. In an answering or reply brief, the party shall set forth his objections, together with his reasons therefor, to any proposed findings of any other party, showing the numbers of the statements to which his objections are directed; in addition, he may set forth alternative proposed findings of fact. [The subsequent amendments of this provision noted at 93 T.C. 931, effective as of July 1, 1990, do not affect the instant case.] In the instant case, the parties filed simultaneous briefs. Both parties' opening briefs include proposed findings of fact. However, in violation of Rule 151(e)(3), petitioners' answering brief does not include responses to respondent's proposed findings of fact. It is true that petitioners are appearing pro se. However, we urged petitioners to get a lawyer for this case. Also, we note that petitioners are no strangers to this Court. See Yamamoto v. Commissioner, 73 T.C. 946 (1980), affd. without published opinion 672 F.2d 924 (CA9 1982); Yamamoto v. Commissioner, T.C. Memo. 1986-316 affd. without published opinion 891 F.2d 297 (CA9 1989). See also Yamamoto v. United States, 9 Cl. Ct. 207 (1982), affd. without published opinion 795 F.2d 1018 (CAFC 1986); Yamamoto v. Brown↩, 89-2 USTC par. 9394 (D. Hawaii 1988) (not officially reported). Thus, petitioners have had ample opportunity to familiarize themselves with the Tax Court Rules of Practice & Procedure. Under the circumstances, we have assumed that petitioners do not object to respondent's proposed findings of fact except to the extent that petitioners' proposed findings of fact are clearly inconsistent therewith.
4. This provision has since been amended to require each industrial loan company to maintain cash and securities equal to 7 percent of its liabilities on outstanding certificates and debentures with terms of less than 1 year, and 5 percent of its liabilities on outstanding certificates and debentures with terms of one year or more. Hawaii Rev. Stat. sec. 408↩.14(c).
5. See Yamamoto v. Commissioner, T.C. Memo. 1986-316, affd. without published opinion 891 F.2d 297↩ (CA9 1989).
6. The notice of deficiency states that petitioners had $ 99,458 investment interest for 1980 ($ 83,351 interest on debts incurred after September 10, 1975, and $ 16,107 interest on debts incurred after December 16, 1969, but before September 11, 1975), $ 132,879 investment interest carryover from prior years, a maximum allowable 1980 investment interest deduction of $ 112,693 ($ 96,586 interest on debts incurred after September 10, 1975, and $ 16,107 interest on debts incurred after December 16, 1969, but before September 11, 1975), and $ 119,644 investment interest carryover to 1981. Evidently, the amounts were rounded, since these figures indicate that the additional deduction should be $ 13,235, rather than the $ 13,234 that was allowed. Neither side attempts to reconcile petitioners' $ 105,810.56 Schedule C interest deduction with the $ 99,458 investment interest that the notice of deficiency states was deducted.↩
7. The notice of deficiency states that petitioners had $ 76,644 investment interest for 1981 ($ 65,138 interest on debts incurred after September 10, 1975, and $ 11,506 interest on debts incurred after December 16, 1969, but before September 11, 1975), $ 119,644 investment interest carryover from prior years, a maximum allowable 1981 investment interest deduction of $ 44,544 ($ 33,038 interest on debts incurred after September 10, 1975, and $ 11,506 interest on debts incurred after December 16, 1969, but before September 11, 1975), and $ 151,744 investment interest carryover to 1982. Neither side attempts to reconcile petitioners' $ 73,943.81 Schedule C interest deduction with the $ 76,644 investment interest that the notice of deficiency states was deducted. Also, neither side explains why only $ 14,054 of petitioners' investment interest deduction was disallowed for 1981 if, as the notice of deficiency indicates, petitioners deducted $ 76,644 but were entitled to deduct only $ 44,544 for that year. On this point, we leave the parties as we found them.↩
8. The record does not indicate whether Takahashi gave a note for his 50-percent share of the debt to MFC.↩
9. Takahashi executed two promissory notes to Yamamoto, one for $ 443,991.61 and the other for $ 25,000. Both notes are dated October 21, 1981, nonnegotiable, noninterest-bearing, payable initially only out of distributions to Takahashi by Waianae Associates (a Hawaii limited partnership) from the sale of its lands, and payable from other assets only within 2 years after the last distribution by Waianae Associates.↩
10. Alexander, Grant's finding of a deficit came despite the fact that as of February 10, 1983, the balance sheet maintained by MFC reflected capital of $ 4,016,908.↩
11. Respondent states that the Peat, Marwick report shows "a deficit capital account of $ 16,951,953.00 as of December 31, 1983." That amount does not take into account contributed capital of $ 3,246,300. Our finding is the amount shown in the Peat, Marwick report as "Total stockholders' deficiency" and corresponds to the Alexander, Grant report's deficit of $ 16,838,359 as of 10-1/2 months earler.↩
12. Although petitioners argue that Yamamoto's actions made MFC a healthier company, we suspect that the transactions merely masked MFC's ill health.↩
13. Section 163 provides, in pertinent part, as follows: SEC. 163. INTEREST. (a) General Rule. -- There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness. * * * (d) Limitation on Interest on Investment Indebtedness. -- (1) In general. -- In the case of a taxpayer other than a corporation, the amount of investment interest (as defined in paragraph (3)(D)) otherwise allowable as a deduction under this chapter shall be limited, in the following order, to -- (A) $ 10,000 ($ 5,000, in the case of a separate return by a married individual), plus (B) the amount of the net investment income (as defined in paragraph (3)(A)), plus * * * * * * (2) Carryover of disallowed investment interest. -- The amount of disallowed investment interest for any taxable year shall be treated as investment interest paid or accrued in the succeeding taxable year. (3) Definitions. -- For purposes of this subsection -- * * * (D) Investment interest. -- The term "investment interest" means interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment.
[The subsequent amendments of this provision (by sec. 56(b) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 574, by sec. 511(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2244, and by sec. 1005(c)(1) of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102 Stat. 3342, 3390) do not affect the instant case.]↩
14. As we have noted, respondent's 1980 adjustment on this issue increases petitioners' deductions↩ by $ 13,235, and respondent's 1981 adjustment decreases petitioners' deductions by $ 14,054. Petitioners seem to dispute the favorable (to them) 1980 adjustment as vigorously as they dispute the 1981 adjustment.
15. In their expert witness report, petitioners direct us to a conclusion, assertedly stated in Yamamoto v. Commissioner, T.C. Memo. 1986-316, affd. without published opinion 891 F.2d 297 (CA9 1989), that interest paid on only three loans could be characterized as investment interest. We have examined the text of our opinion in T.C. Memo. 1986-316↩ and we do not find the quoted language or the asserted conclusion. We do not know if petitioners' expert witness merely committed an egregious error or intended to mislead us.
16. In Peck v. Commissioner, 904 F.2d 525 (CA9 1990), affg. 90 T.C. 162 (1988), the Court of Appeals for the Ninth Circuit (to which the instant case is appealable) noted that in Montana v. United States, 440 U.S. 147 (1979), the Supreme Court limited the application of the separable facts doctrine ( Commissioner v. Sunnen, 333 U.S. 591 (1948)) to cases where there has been a significant "change in the legal climate." Peck v. Commissioner, 904 F.2d at 527. The Court of Appeals went on to say that there is conflicting authority in the Ninth Circuit as to the continued vitality of the Sunnen separable facts doctrine. The Court of Appeals declined to decide whether the separable facts doctrine, was still good law, stating as follows ( Peck v. Commissioner, 904 F.2d at 528: Assuming, without deciding, that the more restrictive Sunnen test applies, we hold that the Tax Court properly used the collateral estoppel doctrine in this case. Thus, the Court of Appeals for the Ninth Circuit has not decided what is its position on the Sunnen separable facts doctrine. We conclude that respondent has failed to carry his burden of proving that the controlling facts in the instant case are in substance the same as those in T.C. Memo. 1986-316, under the Montana formulation. Clearly, respondent has also failed to prove that the facts in the instant case are not separable from the facts in T.C. Memo. 1986-316, under the Sunnen↩ formulation. Accordingly, it is unnecessary for us to resolve in the instant case the issue that remains unresolved in the Ninth Circuit, and we do not attempt to resolve that issue at this point.
17. Section 163(d)↩ was substantially revised by section 511(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2244. However, that revision applies only to taxable years beginning after December 31, 1986 (sec. 511(e), Tax Reform Act of 1986, 100 Stat. at 2249), and so does not affect the instant case.
18. SEC. 61. GROSS INCOME DEFINED. (a) General Definition. -- Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: * * * (12) Income from discharge of indebtedness;↩
19. As to the $ 408,811.29 note, the borrowings from MFC that gave rise to the six underlying assumed notes found their way to Yamamoto. At trial, Yamamoto seemed to indicate that he had put the money back into MFC, presumably as contributions to capital. We may speculate that Yamamoto created this circle in order to increase MFC's lending capacity. ($ 100,000 borrowed from MFC and then returned to MFC as a capital contribution would, under Hawaii's 10-to-1 law, appear to increase MFC's lending capacity by $ 1,000,000; see n. 12, supra.) However, neither side suggests that the six assumed notes should be ignored as shams. Compare Allen v. Commissioner, 92 T.C. 1, 8-9 (1989), on appeal (CA9 June 13, 1989); Drobny v. Commissioner, 86 T.C. 1326, 1345-1346 (1986); Karme v. Commissioner, 73 T.C. 1163, 1186-1187 (1980), affd. 673 F.2d 1062↩ (CA9 1982). Similarly, both sides treat MFC's payments of Yamamoto's obligations as giving rise to debts owed by Yamamoto to MFC, and not as dividends by MFC to Yamamoto.
20. In Kaplan v. Commissioner, 21 T.C. 134, 144-145↩ (1953), we pointed out that the taxpayer had "complete and sole domination over the affairs of" the corporation that discharged the debt owed by the taxpayer. We concluded that respondent correctly determined that the taxpayer had income from the discharge of indebtedness and that this income was dividend income. In the instant case, no party raises the dividend question. Accordingly, we have not considered such matters as the amount of MFC's earnings and profits or the possible impact of section 301(c).
21. Section 108 provides, in pertinent part, as follows: SEC. 108. INCOME FROM DISCHARGE OF INDEBTEDNESS. (a) Exclusion From Gross Income. -- (1) In general. -- Gross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if -- (A) the discharge occurs in a title 11 case, * * * (d) Meaning of Terms; Special Rules Relating to Subsections (a), (b), and (c). -- * * * (2) Title 11 case. -- For purposes of this section, the term "title 11 case" means a case under title 11 of the United States Code (relating to bankruptcy), but only if the taxpayer is under the jurisdiction of the court in such case and the discharge of indebtedness is granted by the court or is pursuant to a plan approved by the court. [The subsequent amendments of these provisions (by subsections (a) and (b)(3)(B) of sec. 822 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2373, and by paragraphs (1) and (6)(A) of sec. 1004(a) of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102 Stat. 3342, 3385, 3387) do not affect the instant case.]↩
22. SEC. 166. BAD DEBTS. (a) General Rule. -- (1) Wholly worthless debts. -- There shall be allowed as a deduction any debt which becomes worthless within the taxable year.↩
23. SEC. 166. BAD DEBTS. * * * (b) Amount of Deduction. -- For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.↩
24. The parties neither stipulated to, nor presented evidence of, the amount of the interest component of the T-Y Partnership loss deduction. However, both sides seem to accept the amounts stated in a revenue agent's report, selected excerpts from which appear in Au's expert witness report. For purposes of our analysis, we have used the same amounts as to each of the components of the disallowed T-Y Partnership loss deduction. Our conclusions would not be affected by the amounts of each of these components.↩
25. SEC. 166. BAD DEBTS. * * * (d) Nonbusiness Debts. -- (1) General rule. -- In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 1 year. (2) Nonbusiness debt defined. -- For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than -- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. [The subsequent amendments of this provision (by sec. 1001(b)(1) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 1011, and by sec. 1008(d)(1) of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 98 Stat. 3342, 3439) do not affect the instant case.]↩
26. T.C. Memo. 1985-197↩.
27. In the notice of deficiency, respondent disallowed the pass-through deduction, and added the entire disallowed amount into petitioners' taxable income, without calculating the short-term capital loss that should have been allowed in its place. The short-term capital loss is to be given effect in the computation under Rule 155.↩